# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of Patel*, 2013 IL App (1st) 112571

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF SUNIL A. PATEL, Petitioner-Appellee, and AMY E. SINES-PATEL, Respondent-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-2571 |
| Filed | June 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the dissolution of the marriage of petitioner physician and respondent mother with multiple college degrees and training, but little actual work experience, the appellate court upheld the award of maintenance in gross to respondent, the award of attorney fees to respondent's numerous counsel, the denial of her request for contribution toward her fees, the order requiring her to contribute to petitioner's attorney fees and to a larger share of the child representative's fees, and the order requiring her to pay the cost of the professional supervisor of her visitation. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-D-10380; the Hon. Nancy Katz, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

William J. Arendt and Nicola K.B. Latus, both of William J. Arendt &
Associates, P.C., of Burr Ridge, for appellant.

Diane M. Panos, of Panos & Associates, LLC, of Palos Heights, for
appellee Sunil A. Patel.

John A. Coladarci, of Coladarci & Coladarci, of Chicago, for appellee
Coladarci & Coladarci.

Panel

JUSTICE HALL delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Gordon concurred in the judgment
and opinion.

## OPINION

¶ 1     The respondent, Amy Sines-Patel (Amy), appeals from the entry of the judgment for
dissolution of her marriage to the petitioner, Sunil Patel (Sunil). In her previous appeal, this
court affirmed the trial court's decision to award sole custody of the parties' two minor
children to Sunil and ordering that Amy's visitation with the children be supervised. See *In
re Marriage of S.P.*, 2011 IL App (1st) 111407-U (*Patel I*).

¶ 2     In her present appeal, Amy contends that the trial court erred when it: (1) found that Amy
dissipated marital assets; (2) determined that money Amy received from her father was not
a marital debt; (3) awarded Amy nonmodifiable maintenance in gross; (4) awarded attorney
fees to Amy's former attorneys; (5) denied Amy's request for contribution from Sunil to her
attorney fees; (6) ordered Amy to contribute to Sunil's attorney fees; (7) ordered Amy to pay
a disproportionate amount of the child representative's fees; and (8) ordered Amy to pay the
cost of the visitation supervisor.[1]

¶ 3     Our review of the record on appeal reveals no error by the trial court, and we affirm the
judgment for dissolution of marriage. The pertinent facts are taken from the record on appeal
and from this court's order in *Patel I*.

¶ 4                                    BACKGROUND

¶ 5     Sunil and Amy were married on November 12, 2000. At the time of these proceedings,

---

[1]The law firm of Coladarci and Coladarci, one of the firms that represented Amy in this case,
was granted to leave to file an appellee's brief. The firm's brief adopted Sunil's appellee's brief.

Sunil was 42 years of age and a physician, earning approximately $475,000 per year. Amy was 35 years of age and had both undergraduate and graduate degrees but, until the parties' separation, she did not work outside of the home. At the time of the hearing, she earned approximately $14,500 per year, doing office work for a doctor and working at her church. The parties had two children: Elizabeth, born October 2, 2002, and Joseph, born November 28, 2003.

¶ 6                                      I. Prehearing Proceedings

¶ 7        On October 17, 2008, Amy filed a petition for dissolution of marriage in the circuit court of Du Page County. She also filed a petition for an order of protection, alleging that Sunil had inflicted physical and emotional abuse on the parties' children and her. She later alleged Sunil had sexually abused Elizabeth. On October 28, 2008, Sunil filed his petition for dissolution of marriage in the circuit court of Cook County. Pursuant to Sunil's motion, the Du Page County circuit court transferred Amy's dissolution case, which had been consolidated with her order of protection petition, to the circuit court of Cook County. Thereafter, all proceedings took place in Cook County circuit court.

¶ 8                                   A. Temporary Custody and Support

¶ 9        On November 5, 2008, the circuit court entered an order appointing attorney Joel Levin as the child representative, ordered that Sunil's visitation with the children be supervised and that the supervisor's fee be paid by Sunil. Prompted by Amy's complaints, the Department of Children and Family Services (DCFS) investigated but concluded that Amy's charges of abuse against Sunil were unfounded. On February 10, 2009, the trial court granted Sunil unsupervised visitation with the children. The parties agreed that Sunil would pay Amy $6,000 per month in temporary support.

¶ 10       On May 19, 2009, Dr. Phyllis Amabile, a psychiatrist and the court-appointed evaluator, filed her report with the court. Dr. Amabile concluded that many of the accusations Amy made against Sunil were false, but that in making the accusations, Amy was "delusional" rather than deliberately lying. Sunil then moved to have Amy undergo a mental health evaluation and for transfer of custody of the children to him. The trial court ordered that Amy be evaluated by Sunil's mental health expert, Dr. Stephen Dinwiddie, a forensic psychiatrist. Dr. Dinwiddie diagnosed Amy as suffering from "delusional disorder," which "is characterized by the presence of fixed, false beliefs with minimal insight into the implausibility of those beliefs." *Patel I*, 2011 IL App (1st) 111407-U, ¶ 25. Amy's delusional disorder was associated with an elevated risk of violence toward her children. On June 26, 2009, following the submission of Dr. Dinwiddie's report, the court ordered that Sunil have temporary custody of the children and that Amy's visitation be supervised. *Patel I*, 2011 IL App (1st) 111407-U, ¶ 28.

¶ 11                                      B. Discovery

¶ 12       In January 2009, Amy's attorneys, the law firm of Schiller, DuCanto and Fleck (the

Schiller firm) were granted leave to withdraw. The law firm of Rinella and Rinella (the Rinella firm) began representing Amy in February 2009.

¶ 13        On March 12, 2009, Sunil served Amy with a request for the production of documents and with interrogatories in order to ascertain the identity and testimony of the witnesses she intended to call at trial pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007). *Patel I*, 2011 IL App (1st) 111407-U, ¶ 29. While the rule required that Amy respond within 28 days, Amy did not respond to the request until July 17, 2009. She tendered some documents and listed only the parties as witnesses. On August 31, 2009, the trial court set a trial date of January 25, 2010, and ordered the parties to update their discovery disclosures by November 24, 2009. *Patel I*, 2011 IL App (1st) 111407-U, ¶¶ 29-30.

¶ 14        On September 21, 2009, Sunil filed a motion to compel Amy to comply with his document request of March 12, 2009. Sunil alleged that Amy's July 17, 2009, response was incomplete. He further alleged that his attorney had attempted to resolve the matter with Amy's attorney pursuant to Illinois Supreme Court Rule 201(k) (eff. July 1, 2002), but no additional documents were produced. Due to the withdrawal of the Rinella firm and the appearance of Amy's new attorneys, Pasulka and Associates, P.C. (the Pasulka firm), the trial date was continued to April 28, 2010, and the discovery cutoff date was extended to April 15, 2010. The trial court ordered Amy to comply with Sunil's March 12, 2009, production request by February 1, 2010. In the event she failed to comply, the order provided that Amy would incur a fine of $100 per day. As of February 1, 2010, Amy had not complied with the production request, and the fine began to accumulate. The Pasulka firm then withdrew. *Patel I*, 2011 IL App (1st) 111407-U, ¶¶ 33-34.

¶ 15        On February 16, 2010, the trial court ruled on Amy's emergency motion to reschedule the depositions of certain family members. The court entered an order allowing the substitution of law firm of Coladarci and Coladarci (the Coladarci attorneys) to represent Amy and continued the issue of the depositions to February 18, 2010. The order further provided that Sunil's attorney was to tender to Amy's attorney the bill for costs and fees necessitated by the rescheduling of the depositions. On February 18, 2010, the trial court rescheduled the depositions. The court acknowledged in the order that Sunil's attorney had tendered the bill for the depositions to Amy's attorney. Amy was ordered to pay the rescheduling fees at a pretrial hearing on March 3, 2010.

¶ 16        On April 5, 2010, Sunil filed a motion to bar Amy from using any documentary evidence at trial that she had not previously tendered and from calling any lay or expert witness she had not previously disclosed. Due to the unavailability of the trial judge, the April 28, 2010, trial date was continued, first to July 12, and then to July 19, 2010. On May 12, 2010, Amy disclosed 34 witnesses but requested that discovery be extended to allow her experts, Drs. Chapman and Krause, to submit their reports and to be deposed by Sunil. Sunil responded that it would be impossible to complete discovery with regard to Amy's experts by the trial date. *Patel I*, 2011 IL App (1st) 111407-U, ¶¶ 35-39.

¶ 17        On June 3, 2010, the Coladarci attorneys filed an emergency motion to withdraw as Amy's attorneys. The motion was denied without prejudice on June 9, 2010. On June 17, 2010, the trial court found that Amy's answers did not comply with Rule 213 and that she

had failed to comply with the rules and court orders regarding the disclosure of her witnesses. The trial court refused to continue the trial date and barred Amy from introducing her expert witnesses' opinions at trial or from calling them as witnesses.

¶ 18 On June 30, 2010, the trial court heard arguments on several motions filed by the parties. *Inter alia*, the court found that Amy had violated the June 17, 2010, order by filing Dr. Chapman's report with the clerk of the court. The court prohibited Amy from filing any *pro se* motions without leave of court and barred her from using or referencing any documents that existed prior to February 2, 2010, but not previously tendered pursuant to prior court orders. On July 21, 2010, the trial court found that Amy had violated the court's June 30, 2010, order, *inter alia*, by filing motions with the court *pro se* and failing to file a formal response to Sunil's request for the production of documents. The court entered an order granting Amy's motion to represent herself and ordered the Coladarci attorneys[2] to act as standby counsel. The court barred Amy from using any trial exhibits except her financial disclosure statement, exhibits marked and tendered by Sunil and any documents of which the court could take judicial notice.

¶ 19                                   II. The Hearings

¶ 20 On July 21, 2010, the trial court found that the grounds for the dissolution of the parties' marriage had been proven. The case then proceeded to a contested hearing on the remaining issues. The proceedings were held on various dates and concluded on November 1, 2010. The majority of the testimony at trial was related to the issue of child custody, which is not at issue in this appeal. See *Patel I*, 2011 IL App (1st) 111407-U (providing a detailed discussion of the evidence and testimony at trial bearing on the issue of custody and the need for supervised visitation).

¶ 21 The evidence pertinent to the maintenance and attorney fees issues are summarized below. Additional pertinent evidence will be set forth in connection with the issue to which it relates.

¶ 22                              A. Maintenance for Amy

¶ 23 Amy graduated from the University of Michigan in 1997 with a bachelor of arts degree in psychology. In 2002, she received a law degree from De Paul University but did not take the bar examination. At the time of trial, Amy was 35 years old and in good health. She wanted to take the bar examination and estimated the cost of a review class and taking of the exam to be $5,000. However, she had not yet signed up for the exam. Instead, Amy was attending Northern Seminary part-time to obtain a master's degree in theology. She took one class per semester at a cost of $1,320 per class. She had completed 4 out of the 15 classes necessary for her degree. Her goal was to work at the Lawndale Christian Center, which provides medical and legal services to the poor. Amy acknowledged that a master's degree

---

[2]On August 26, 2010, the trial court ordered the Coladarci attorneys released from serving as Amy's standby counsel and as attorneys of record.

was not required to work at the Center.

¶ 24 Amy worked part-time for Dr. Park, an internist, doing office work and taking patients' vital signs, and at Christ Church of Oak Brook doing childcare several hours a week. Amy worked approximately 25 hours per week at $9 an hour for Dr. Park and earned $30 per week at Christ Church. Amy applied for work as a server at a number of restaurants and at a tanning salon, working behind the counter. She did not seek a management position. None of the jobs she applied for required her advanced degrees. Amy denied that she would be able to earn sufficient income to provide for herself by working for Dr. Park. She acknowledged that she had answered yes to the same question in her deposition. With regard to Amy's ability to work, Dr. Dinwiddie testified that Amy's delusional disorder did not mean she could not work or work effectively.

¶ 25 Amy was questioned extensively about her living expenses listed on her disclosure statement. Her testimony revealed that she was uncertain as to the amount of her expenses and that her disclosure statement contained inaccuracies. For example, Amy initially stated that her father had paid $200,000 of her legal expenses. After modifying the amount to $170,000, she stated that her father would be better able to testify as to the amount.

¶ 26                                      B. Attorney Fees

¶ 27 Between November 15, 2010, and January 4, 2011, the trial court conducted a hearing on the final attorney fee petitions filed by Sunil's attorney and the various law firms that had represented Amy. Throughout these proceedings, Sunil was represented by attorney Diane Panos. From October 2008 until January 2009, Amy was represented by the Schiller firm.[3] Thereafter, she was represented by three different law firms until the trial court granted her motion to appear *pro se*. Each of the law firms provided detailed billing statements itemizing the outstanding fees and costs owed to it and presented testimony as to the work performed. Amy cross-examined the the witnesses, but she presented her own case only in response to the Coladarci fee petition.

¶ 28                                   1. *The Rinella Firm*

¶ 29 The Rinella firm represented Amy from February 3, 2009, until October 30, 2009. Amy did not dispute the expertise or the hourly rates of the attorneys who performed the legal services on her behalf in this case. Attorneys Joseph Phelps and Michael Chiero testified on behalf of the Rinella firm and were cross-examined by Amy as to the services they performed for her.

¶ 30 In her cross-examination, Amy attempted to secure admissions from the attorneys that they had failed to adequately comply with discovery requests, failed to ensure that the reports of Drs. Chapman and Krause would be completed and disclosed timely, and as of October 2009, had not begun to prepare for trial then scheduled for January 2010. According to attorney Chiero, Amy refused to comply with discovery requests and refused to sign the

---

[3]The attorney fee award to the Schiller firm is not at issue in this appeal.

responses to Sunil's motions that he prepared.

¶ 31    The Rinella attorneys explained that their fees were increased by the involvement of James Sines, Amy's father, in the case. Amy authorized the attorneys to communicate with Mr. Sines, who involved himself in the strategy and direction of the case. The Rinella attorneys spent time communicating with attorneys representing the Sines family in dealing with Sunil's attempts to secure the production of documents and depositions. The fees were also increased by Amy's insistence that two attorneys appear for her at court appearances because two attorneys appeared on Sunil's behalf at court appearances.

¶ 32    *2. The Pasulka Firm*

¶ 33    The Pasulka firm represented Amy from November 9, 2009, until February 16, 2010. Attorney Jon Stromstra testified on behalf of the Pasulka firm and was cross-examined by Amy.

¶ 34    Attorney Stromstra graduated from law school in 1984. His experience in the practice of law included litigation for various firms and agencies. Prior to joining the Pasulka firm in 2008, he had some family law experience as part of his general practice. The billing rates set forth in invoices sent to Amy were the same as those set forth in the engagement contract between Amy and the Pasulka firm. The hourly rate of $375 was considered fair and reasonable in Cook County.

¶ 35    Attorney Stromstra was in charge of Amy's case. After receiving Amy's file from the Rinella firm, he prepared responses to motions that had not previously been answered and responded to Sunil's production request with the documents Amy had provided. He obtained a continuance of the January 25, 2010, trial date because of the progress he was making in filing responses and complying with Sunil's discovery requests.

¶ 36    During the Pasulka firm's representation of Amy, attorney Stromstra was contacted by Mr. Sines, who wanted to discuss Amy's case with him. With Amy's consent and authorization, attorney Stromstra had telephone conversations with Mr. Sines. Mr. Sines also participated in a conference attorney Stromstra had with Amy and other Pasulka personnel. Amy discharged the Pasulka firm immediately prior to the February 16, 2010, scheduled depositions of her family members.

¶ 37    *3. The Coladarci Attorneys*

¶ 38    Attorneys John Coladarci and Anne Coladarci represented Amy from February 16, 2010, until August 26, 2010. Both attorneys testified as to their work on behalf of Amy and were cross-examined by Amy.

¶ 39    When the Coladarci attorneys accepted Amy's case, they were aware that a great deal of work was required to prepare the case for the April 2010, trial date. Initially, their intent was to achieve a successful result for Amy in a trial. After reviewing the file, the attorneys determined that the best strategy was to avoid a trial at all costs and settle the case.

¶ 40    The Coladarci attorneys understood that custody of the children was a significant issue in the case. They advised Amy and Mr. Sines that pursuing the claims that Sunil had abused

the children would not be successful. In response, Amy and Mr. Sines brought in attorney Arnold Goldstein, who was more enthusiastic about pursuing the abuse claims against Sunil. Attorney Goldstein never filed an appearance in the case.[4] Nonetheless, his involvement created additional work for the Coladarci attorneys because he had to be brought up to date on the status of the case and was pursuing a strategy they had previously rejected.

¶ 41 The Coladarci attorneys acknowledged that they did not file the motions requested by Mr. Sines. In their view, the motions were either unnecessary, would be unsuccessful, or were matters for the hearing on the petition for dissolution, such as Amy's request to have her visitation unsupervised.

¶ 42 The Coladarci attorneys were aware that Amy did not want to pursue a settlement but attempted to persuade her that, in light of what they believed the evidence at hearing would reveal, settling the case would be in her best interests. At the same time, their efforts to prepare for trial were hampered by Amy's refusal to communicate with them. The attorneys attempted to withdraw from the case, but their motion was initially denied. While they eventually received Dr. Chapman's report, the doctor's "outside" contact with Amy compromised any benefit his report or testimony might have for her case. Dr. Krause needed to interview Sunil before he could finalize his evaluation, but the trial court refused to delay the trial.

¶ 43                                      III. Judgment

¶ 44 On August 9, 2011, the trial court entered a judgment dissolving the marriage of the parties, awarding sole custody of the children to Sunil, dividing the parties' marital and nonmarital assets and debts and allocating the payment of maintenance, attorney fees and other fees incurred during the litigation. The court awarded Amy 55% of the assets and Sunil 45% of the assets. The portions of the judgment pertinent to the issues raised on appeal are set forth below.

¶ 45                          A. Dissipation of Marital Assets

¶ 46 Between November 8, 2008, and February 3, 2009, Sunil's visitation with the children was supervised. The supervision was necessitated by Amy's false claims of abuse against Sunil and her coaching of the children to make false statements against Sunil. The trial court concluded that Amy had dissipated marital assets in the amount $6,923.75, the cost of the supervised visitation.

¶ 47                               B. Marital Debts

¶ 48 The trial court ordered that each party be responsible for his or her own credit card indebtedness. While Amy had included $45,000 of credit card debit on her disclosure form,

---

[4]Amy and Mr. Sines also retained attorney Margaret Scholand to assist the Coladarci attorneys with the organizational aspects of the case. Attorney Scholand did not file an appearance in the case.

the court found that there was no credible evidence to support that amount. The court further found that Amy had failed to establish that $170,000 she received from her father was a marital debt and ordered that Amy be solely responsible for any repayment of the amount to her father.

¶ 49                                    C. Maintenance

¶ 50    The trial court ordered Sunil to pay to Amy the sum of $210,000 over a period of 30 months as maintenance in gross. The court acknowledged that Amy had no experience in using her degrees and had no real job experience. However, following the transfer of custody of the children to Sunil in June 2009, she had not taken any steps to become self-supporting. Instead, she chose to pursue another advanced degree which was not required for the work she planned to do in the future, while working at low-paying jobs that did not utilize the degrees she already had.

¶ 51    In rejecting Amy's request for an award of reviewable periodic maintenance, the trial court stated that it had considered the factors set forth in section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/504(a) (West 2008)), in particular, the short term of the marriage, the length of the parties' separation, the property division, the fact that since January 2009, Sunil had been paying Amy $6,000 per month in support and continued to do so even after the children no longer resided with Amy, and Amy's failure to seek out appropriate employment in order to become self-supporting. The court determined that the maintenance in gross was appropriate since it would provide Amy with an additional period of support "while she develops and implements a realistic plan for employment and self-sufficiency."

¶ 52                                   D. Attorney Fees

¶ 53                                 1. *Amy's Attorneys*

¶ 54    The trial court awarded fees to Amy's attorneys in the following amounts: $85,550.68 to the Schiller firm[5]; $21,611.02 to the Rinella firm; $20,157.50 to the Pasulka firm; and $60,773.92 to the Coladarci attorneys. Judgment in the amount of the fees was entered in favor of the attorneys and against Amy.

¶ 55    The trial court found the rates charged by the attorneys to be reasonable and the testimony of the attorneys credible. Noting that the case involved complex issues, the court went on to find that all the law firms had experienced the same problems in representing Amy. The attorneys all had difficulty in communicating with Amy, particularly in securing her cooperation to comply with discovery requests. In addition, there was the extraordinary extent to which Mr. Sines participated in the litigation. His participation included bringing in his own attorneys to represent his family's interest, hiring an attorney to work on Amy's case in order to pursue the abuse claims, acting to have certain motions filed and even preparing his own motion for modification of visitation. These problems contributed to the

---

[5]Judgment as to the Schiller fees was entered against Amy and Mr. Sines, as guarantor.

amount of the fees incurred by the various law firms in their representation of Amy.

¶ 56                                         2. *Contribution*

¶ 57        The trial court denied Amy's request that Sunil contribute to her attorney fees. The court found that Amy had not shown that she was incapable of paying her own fees. The court pointed out that Amy was receiving 55% of the marital assets, $210,000 in maintenance in gross and was capable of earning a higher income. While Sunil's current income exceeded hers, he also had substantial attorney fees to pay and was the sole support for the children for the next 30 months as well as having to pay Amy the maintenance in gross.[6]

¶ 58        The trial court found that Sunil should be responsible for his own attorney fees except where Amy's conduct had unnecessarily increased the amount of his attorney fees. These included: Amy's failures to comply with discovery, her violation of court orders, the cost for the depositions that were cancelled, which she was previously ordered to pay, and her false allegations of abuse against Sunil. The court ordered that $60,035.50 of Sunil's attorney fees be paid by deducting that amount from Amy's share from the sale of the marital residence. In light of the contribution award, the trial court chose not to require Amy to pay the $14,500 in accumulated fines owed from the February 1, 2010, order imposing the $100-per-day sanction for failing to comply with discovery.

¶ 59                                 3. *Child Representative's Fee*

¶ 60        The parties stipulated to the reasonableness and the necessity of attorney Levin's fees. The fees had been paid from the marital estate, except for $23,820.15. The trial court found that attorney Levin's fees increased as a result of Amy's false allegations and unreasonable litigation positions and ordered that she be responsible for the $23,820.15. The order provided that Sunil would pay attorney Levin the balance owed, and that amount would be deducted from Amy's share of the marital estate.

¶ 61                                 E. Cost of Supervised Visitation

¶ 62        The trial court ordered Amy to pay the cost for the professional supervision of her visitation with the children. The trial court considered that Sunil was paying all of the children's expenses and that with the asset distribution, the maintenance she was awarded and her ability to work, Amy had the ability to pay the cost of the professional supervisor.

¶ 63        Amy filed a timely notice of appeal.

¶ 64                                         ANALYSIS

¶ 65                                     I. Standards of Review

¶ 66        The following issues are reviewed under the manifest weight of the evidence standard:

---

[6]The trial court had reserved the issue of Amy's child support obligation for 30 months.

-10-

dissipation of marital assets (*In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008))[7] and the validity of a marital debt (*In re Marriage of Awan*, 388 Ill. App. 3d 204, 213 (2009)). "A decision is said to be against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented." *Brynwood Co. v. Schweisberger*, 393 Ill. App. 3d 339, 351 (2009).

¶ 67    The following issues are reviewed for an abuse of discretion: the propriety, amount and duration of an award of maintenance (*In re Marriage of Miller*, 231 Ill. App. 3d 480, 485 (1992)); child representative's fees and costs (*In re Marriage of Soraparu*, 147 Ill. App. 3d 857, 864 (1986)); attorney fee awards under section 508 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/508 (West 2010)) (*In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005)); and parenting-time-related costs (*In re Marriage of Osborn*, 206 Ill. App. 3d 588, 605-06 (1990)). "A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court." *Schneider*, 214 Ill. 2d at 173.

¶ 68                                   II. Discussion

¶ 69                          A. Manifest Weight of the Evidence

¶ 70                          1. *Dissipation of Marital Assets*

¶ 71    A spouse dissipates marital assets when he or she uses marital property for his or her own benefit for a purpose unrelated to the marriage when the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641, 652-53 (2009). In dividing the marital estate, the trial court may take into account a spouse's dissipation of marital assets. 750 ILCS 5/503(d)(2) (West 2008). The spouse charged with dissipation bears the burden of establishing by clear and convincing evidence how the funds were spent. *Sanfratello*, 393 Ill. App. 3d at 653. Whether a course of conduct constitutes dissipation depends on the facts of the particular case. *In re Marriage of Aslaksen*, 148 Ill. App. 3d 784, 788 (1986).

¶ 72    Amy contends that the trial court erred when it found that she had dissipated marital assets by making false abuse allegations against Sunil. She argues that the funds expended for his supervised visitation cannot constitute dissipation because the fees were not incurred by her for her sole benefit and because they were incurred as the result of a court order. See *In re Marriage of Seversen*, 228 Ill. App. 3d 820 (1992) (wife's expenditure for reasonable living expenses after she was barred from the marital residence did not constitute dissipation of marital assets). *Seversen* does not permit a party to avoid a finding of dissipation simply because the funds which were expended were necessitated by a court order.

¶ 73    The record in this case and this court's analysis in the prior appeal reflect that the requirement that Sunil's visitation with the children be supervised was the direct result of

---

[7]See *In re Marriage of Vancura*, 356 Ill. App. 3d 200 (2005) (clarifying that the manifest weight of the evidence standard, not the abuse of discretion standard, applies to the review of rulings on dissipation of assets).

Amy's false allegations. We found that "there was significant evidence supporting the trial court's finding that the bizarre accusations leveled by [Amy] aganist [Sunil] were false." *Patel I*, 2011 IL App (1st) 111407-U, ¶ 105.

¶ 74 Amy does not contest that the parties' marriage was undergoing an irreconcilable breakdown at the relevant time period. The evidence established that, but for Amy's false allegations against Sunil, the supervised visitation fees would not have been incurred. Therefore, the trial court's finding that Amy dissipated marital assets was not against the manifest weight of the evidence.

¶ 75                                    2. *Marital Debts*

¶ 76 Amy contends that the finding that the money she received from Mr. Sines was a gift was against the manifest weight of the evidence. "In Illinois, a transfer from parent to child is presumed to be a gift [citation], and the gift presumption may be overcome only by clear and convincing evidence to the contrary. [Citations.]" *In re Marriage of Marcello*, 247 Ill. App. 3d 304, 314-15 (1993). However, property received during the marriage is presumed to be marital property. 750 ILCS 5/503(b) (West 2008). Where the nature of the property is at issue, the presumptions cancel each other out, leaving the trial court free to determine if it was marital or nonmarital property or debt. See *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 88.

¶ 77 Amy points out that the only evidence at trial relevant to the issue was her testimony that Mr. Sines loaned her approximately $170,000 to pay her attorney fees and litigation costs. Since the trial court acknowledged that there was evidence that Mr. Sines paid Amy's attorney fees throughout the proceedings, Amy reasons that she sustained her burden of proof.

¶ 78 In *Marcello*, the wife testified that money received from her father was a marital debt but presented no documentation to support her testimony. Since the trial court was charged with weighing the testimony of the witnesses and determining their credibility, the reviewing court upheld the trial court's determination that the money was not a marital debt. *Marcello*, 247 Ill. App. 3d at 314-15. Likewise, it was the function of the trial court here to accept or reject Amy's testimony that the money from Mr. Sines was a loan. The trial court found that Amy was not a credible witness. In addition, Amy presented no documentation to establish that the money paid by Mr. Sines was a loan to Amy.

¶ 79 Amy points out that she was unable to present any documentary evidence of the loan because of the discovery sanctions imposed against her by the trial court. She argues that the imposition of the sanctions was an abuse of discretion. We disagree. The record in this case supports the trial court's imposition of sanctions based on Amy's repeated failure to comply with discovery and her failure to provide reasonable explanations for the failures to comply. Moreover, the sanctions imposed did not prevent Amy from calling Mr. Sines as a witness in her case, and he could have testified to his intent in providing the money used to pay her attorneys. See *Hluska*, 2011 IL App (1st) 092636, ¶ 81 (the most relevant evidence in determining whether property was a gift was the testimony of the donor).

¶ 80 We conclude that the trial court's finding that the money from Mr. Sines was a gift was

-12-

not against the manifest weight of the evidence.

¶ 81                           B. Abuse of Discretion

¶ 82                              1. *Maintenance*

¶ 83    In awarding maintenance, either periodic or in gross, the trial court considers the following factors: (1) the income and property of each party; (2) the respective needs of the parties; (3) the present and future earning capacity of each party; (4) any impairment to the parties' present or future earning capacity, resulting from domestic duties or delayed education or employment opportunities due to the marriage; (5) the time necessary for the party seeking maintenance to acquire the necessary education or training, whether that party can support himself or herself through appropriate employment, or whether as the custodial parent, it is not appropriate for the party to seek employment; (6) the standard of living during the marriage; (7) the duration of the marriage; (8) the age and physical and emotional condition of both parties; (9) the tax consequences of the property division; (10) the contributions by the spouse seeking maintenance to the education and career of the other spouse; (11) the valid agreement of the parties; and (12) "any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2008).

¶ 84    No one factor is determinative in the decision to award maintenance. *In re Marriage of Pearson*, 236 Ill. App. 3d 337, 350 (1992). The trial court is not required to give equal weight to each factor so long as the court's balancing of the factors is reasonable. *In re Marriage of Reynard*, 344 Ill. App. 3d 785, 791-92 (2003).

¶ 85    Absent exceptional circumstances, periodic maintenance is the judicially preferred form of maintenance. See *Musgrave v. Musgrave*, 38 Ill. App. 3d 532, 534 (1976). Nonetheless, our supreme court has held that section 504(a) of the Act "authorize[s] the trial judge to award maintenance in gross if he finds it to be appropriate in a particular case." *In re Marriage of Freeman*, 106 Ill. 2d 290, 298 (1985).

¶ 86    Amy contends that the trial court abused its discretion when it awarded her maintenance in gross. As Amy notes, it was uncontested that during the parties' marriage she was the children's primary caregiver while Sunil provided the financial support for the family. She did not work outside of the home until after the parties separated. At the time of trial, she earned approximately $14,500 per year from two part-time jobs, while Sunil earned approximately $475,000 or more per year. Despite her educational background, Amy reasons that periodic maintenance is required in this case because she has never been employed as an attorney, her present employment consists of low paying part-time jobs, and her success in finding employment that would allow her to continue to enjoy the parties' standard of living during the marriage is highly uncertain. Finally, Amy asserts that, having found that she was entitled to maintenance, the trial court's award of maintenance in gross was intended as punishment for her failure to comply with discovery and her false allegations of abuse by Sunil.

¶ 87    "The policy underlying maintenance awards is that a spouse who is disadvantaged through marriage be enabled to enjoy a standard of living commensurate with that during the marriage." *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 970 (1992). Under the Act, a

spouse requesting maintenance has "an affirmative duty *** to seek and accept appropriate employment." *Schuster*, 224 Ill. App. 3d at 970. Where a spouse has the means of earning more income, he or she may not use self-imposed poverty as a basis for claiming maintenance. *Schuster*, 224 Ill. App. 3d at 970.

¶ 88 Amy relies on *Pearson* and *In re Marriage of Smith*, 150 Ill. App. 3d 34 (1986). In *Pearson*, the 46-year-old wife had worked as a substitute teacher and possessed a current teaching certificate but had not had full-time employment in 24 years. She also suffered from medical problems that made her future employability uncertain. The reviewing court held that the trial court abused its discretion by imposing a 36-month limitation on the award of rehabilitative maintenance to the wife. *Pearson*, 236 Ill. App. 3d at 350.

¶ 89 In *Smith*, the parties had been married for 28 years. Under the judgment, the husband received $120,000 in assets. The wife received $81,465 in assets and was awarded $1,200 per month for 12 years as maintenance in gross. On review, the court found few if any of the factors present which would make an award of periodic maintenance unfeasible. While acknowledging that the wife had the potential and ability to become a full-time teacher, the reviewing court found that at present she had no income upon which to continue her standard of living and that the maintenance in gross award did not allow for the "innumerable combinations and permutations of factors which might have changed in the upcoming years." *Smith*, 150 Ill. App. 3d at 37. The court concluded that awarding maintenance in gross was an abuse of discretion. *Smith*, 150 Ill. App. 3d at 37.

¶ 90 Both *Pearson* and *Smith* are distinguishable. Both cases involved long-term marriages, where the wives had not worked full-time for many years. In contrast, Sunil and Amy were married only eight years prior to their separation. Amy had received her law degree only five years prior to the parties's separation. In *Pearson*, while the husband argued that the wife was alleging illness to avoid finding appropriate full-time employment, the court found that the wife's medical condition did impact her future employability. In the present case, Amy's delusional disorder did not prevent her from finding employment. In *Smith*, the husband received the greater share of the parties' assets. In the present case, Amy was awarded 55% of the parties' assets.

¶ 91 We also find *In re Marriage of Rothbardt*, 99 Ill. App. 3d 561 (1981), distinguishable. The parties were married in 1966, and the wife worked until 1973 when their son was born. In 1976, the wife obtained a Ph.D. in mathematics education and a law degree in 1980. At the time of the 1980 judgment, she had failed the bar exam twice. The trial court awarded her maintenance for nine months and barred her from future maintenance. On review, the court found that the nine-month limitation was based on the trial court's belief that the wife would pass the bar on her third attempt, and in any event, she could obtain employment based on her degrees. Noting that the wife had failed the bar exam for a third time, the court concluded that, while the nine-month duration was not an abuse of discretion, barring the wife from future maintenance based only on speculation that the wife would then be self-sufficient was an abuse of discretion. *Rothbardt*, 99 Ill. App. 3d at 569.

¶ 92 In the present case, the trial court found that Amy had made no effort to use her advanced degrees to obtain full-time employment. Despite the fact that since 2009, she no longer had

-14-

custody of the children and was receiving $6,000 per month in support, Amy did not take the opportunity of preparing for or taking the bar exam, which would allow her to work as an attorney. Instead, she chose to pursue another advanced degree not necessary for her current employment.

¶ 93       The record does not support Amy's claim that the award of maintenance in gross was intended to punish her for her discovery violations and her false charges of abuse against Sunil. In determining that the award was appropriate, the trial court explained as follows:

> "Maintenance in gross also provides a degree of finality so that both Amy and Sunil can plan their futures. There is no doubt that this litigation has been destructive to the emotional and financial well-being of both parties and to the children. Based on the litigiousness shown by Amy, this Court finds that maintenance in gross is a reasonable approach to providing further support to Amy while eliminating the prospect of future and ongoing litigation between the parties."

¶ 94       The elimination of endless and destructive arguments between the parties over personal or financial matters is a factor in awarding maintenance in gross. See *In re Marriage of Sahagian*, 70 Ill. App. 3d 562, 566 (1979) (the severe disagreements of the parties was one factor in awarding alimony in gross); compare *Musgrave*, 38 Ill. App. 3d at 534 (alimony in gross would not solve the parties' "bickering," since they had children whose needs required them to remain in contact with each other). Even though Amy and Sunil will still have contact because of their children, the trial court properly sought to limit future opportunities for litigation in this case by awarding maintenance in gross to Amy. Finally, the judgment reflects that the trial court considered the tax consequences to the parties of the maintenance in gross award.

¶ 95       In determining whether an abuse of discretion occurred, we bear in mind that "[u]nder the abuse of discretion standard, the question is not whether this court might have decided the issue differently, but whether any reasonable person could have taken the position adopted by the trial court." *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 708 (2006); see *Miller*, 231 Ill. App. 3d at 485 (while the reviewing court might have decided differently, the court was unable to say that no reasonable person could have taken the view adopted by the trial court); see also *Smith*, 150 Ill. App. 3d at 37-38 (Barry, J., dissenting) (where there were factors favoring either periodic maintenance or maintenance in gross, the trial court's decision to award maintenance in gross was equitable and was within its discretion). In this case, the record reflects that the trial court gave due consideration to all the relevant factors in its determination to award Amy maintenance in gross rather than periodic maintenance. See *In re Marriage of Schlosser*, 241 Ill. App. 3d 49, 53 (1993) (the trial court did not err in awarding maintenance in gross where the record established that the court gave the proper consideration to the relevant factors in rendering its decision).

¶ 96       The trial court's award of maintenance in gross was supported by the evidence and was fair and reasonable under the circumstances of this case. We conclude that the award of maintenance in gross was not an abuse of the trial court's discretion.

¶ 97                                    2. *Fee Awards to Amy's Attorneys*

¶ 98        Amy contends that the trial court abused its discretion by awarding attorney fees to the various law firms that had represented her in these proceedings. She argues that the trial court failed to consider whether she benefitted from their work on her behalf. She further argues that the court's finding that the attorneys' charges were fair and reasonable was inconsistent with its finding their actions needlessly increased the cost of the litigation.

¶ 99        With respect to the Rinella firm, Amy contends that she received very little benefit from its work on her behalf. Amy maintains that the Rinella firm failed to answer Sunil's discovery requests, failed to insure that the expert witnesses' reports were filed and disclosed timely and generally failed to prepare for the January 25, 2010, trial date. She argues these failures emanated from a lack of organization on the Rinella firm's part in managing her case. For example, while attorney Phelps testified that he was in charge of the case, he did not recall many of the details relating to the case, such as the receipt of discovery requests and whether responses were filed. Attorney Chiero testified that he only handled the courtroom work and simply assumed attorney Phelps and the staff managed the rest of the case. Amy asserts that the Rinella firm's failure to comply with discovery and the disclosure of the expert witnesses ultimately led to the barring of her evidence and her loss of the custody of her children.

¶ 100       Amy maintains that the work the Rinella firm did do was unnecessary, such as preparing responses to motions that were resolved or moot and spending 11 hours preparing for Sunil's deposition that did not take place. She points out that some of the time records contain vague entries and could not be properly evaluated. Amy maintains that the $75,000 the Rinella firm had already received was fair and reasonable compensation for its work in light of the lack of benefit to her.

¶ 101       With respect to the Pasulka firm, Amy contends that it failed to prove that the work it performed for her was reasonable and necessary because it did not benefit her. While she acknowledges that the Pasulka firm obtained a continuance of the trial date to April 2010, it failed to meet the discovery deadlines, failed to update disclosures, failed to prepare the witness list and secure the experts witnesses' reports, and overall, failed to prepare for the scheduled April trial. Amy argues that attorney Stromstra had difficulty handling her case and did not have sufficient family law experience to justify his hourly rate of $375. She complains that the hourly rate of $200 for secretarial work was excessive. She asserts that the Pasulka firm was not entitled to further fees in addition to the $27,500 previously paid to it.

¶ 102       With respect to the Coladarci attorneys, Amy contends that their work was counterproductive and not in her best interest. The Coladarci attorneys knew that they had a short time to prepare for trial. Instead of preparing for trial, they worked on settling the case, knowing that Amy would never accept the condition that her visitation with the children be supervised for an indefinite period. As a result of their failure to prepare for trial, Amy was barred from calling her expert witnesses, as well as many of her fact witnesses. She asserts that the Coladarci attorneys were not entitled to further fees in addition to the $27,500 they had already been paid.

¶ 103    An appropriate attorney fee consists of reasonable charges for reasonable services. *In re Marriage of Shinn*, 313 Ill. App. 3d 317, 323 (2000). In determining whether the fees charged are reasonable, the trial court considers not only the number of hours the attorney spent on the case but the following factors as well: (1) skill and standing of the attorneys; (2) the difficulty of the issues; (3) the amount and importance of the subject matter in the field of family law; (4) the degree of responsibility involved in the management of the case; (5) the usual and customary charge in the community; and (6) the benefits to the client. *In re Marriage of Malec*, 205 Ill. App. 3d 273, 285 (1990). The fees allowed should compensate for the services rendered and be fair to both the attorney seeking them and the party required to pay them. *Malec*, 205 Ill. App. 3d at 285.

¶ 104    The most important of the factors is the amount of time spent on the case, but the time charged for must be necessary to handle the matter involved. *Malec*, 205 Ill. App. 3d at 285. The burden of proof is on the attorney seeking the fees to establish the value of his services. *Shinn*, 313 Ill. App. 3d at 323.

¶ 105    In this case, the trial court's ruling on the attorney fees followed extensive hearings on the necessity and reasonableness of the fees Amy was charged by the various firms representing her in this case. There was ample evidence that Amy's failure to cooperate or even communicate with her attorneys and the amount of participation by Mr. Sines, which she authorized, contributed a great deal to the fee amounts charged by the attorneys. In addition, the record also reveals numerous examples of how Amy and her father interfered with the attorneys' attempts to resolve the issues in the case by insisting that unnecessary motions be filed and continuing to pursue the meritless abuse claims against Sunil. A clear illustration of this interference was Mr. Sines' drafting his own motion to modify Amy's visitation with the children, intending to attribute the filing of the motion to the Coladarci attorneys.

¶ 106    Amy directs our attention to the Rinella firm's exhibit No. 2 and argues that the vagueness of some of the billing entries prevented a determination as to their reasonableness. The Rinella firm's exhibit No. 2 consists of its billing invoices from February 2009 through September 2009. Amy does not identify which billing entries are vague. Our own review of Rinella's exhibit 2 does not support Amy's claim of vagueness.

¶ 107    Amy complains that attorney Stromstra's limited experience in family law did not justify his hourly rate. However, Amy failed to present any evidence that contradicted attorney Stromstra's testimony that his hourly rate was considered fair and reasonable in Cook County, and she did not deny that she agreed to that hourly rate in the engagement agreement with the Pasulka firm.

¶ 108    Amy places the blame for her inability to present evidence and call witnesses at trial on each of the law firms that represented her, regardless of the time period in which they represented her. Amy ignores the fact that between the commencement of discovery and the hearing on the petition for dissolution, she was given several extensions of time within which to comply with discovery. Moreover, the record reflects that Amy bears the responsibility for any failure to comply with discovery or respond to motions. The attorneys' testimony contained multiple examples of Amy's refusal to sign documents, her resistence to producing

the documentation required to comply with discovery and her refusal to cooperate or communicate with her attorneys.

¶ 109    Amy asserts that the trial court's finding that the attorneys work was reasonable and necessary was inconsistent with its finding that their work needlessly increased the amount of the fees and requires reversal of the judgment. See *Matthews v. Matthews*, 42 Ill. App. 3d 1049, 1053 (1976) (trial court abused its discretion when it found that the husband was financially able to pay the wife's attorney fees, while at the same time allowed the husband to bring the appeal as a poor person). Contrary to Amy's assertion, the trial court found that Amy's conduct and the involvement of Mr. Sines caused the increase in the amount of the attorney fees.

¶ 110    Finally, in addition to all the factors a court considers in fashioning a fee award, when necessary, a court may use its own experience to determine the reasonableness of the fee amounts requested. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 989 (1987). Due to its lengthy involvement with this case and the extensive hearings on the attorney fees issue, the trial court had a detailed understanding of what work was performed by the attorneys and whether it was reasonable and necessary. The trial court did not just accept the billing statements in awarding the fees in this case and in fact disallowed certain of the charges.

¶ 111    We conclude that the trial court did not abuse its discretion in its award of fees to the attorneys who represented Amy in this case.

¶ 112                                   3. *Contribution*

¶ 113    The primary obligation for the payment of attorney fees rests on the party on whose behalf the services were rendered. *In re Marriage of Mantei*, 222 Ill. App. 3d 933, 941 (1991). Under section 508(a) of the Act, the trial court may order a party to contribute a reasonable amount of the opposing party's attorney fees. 750 ILCS 5/508(a) (West 2010). A contribution award is based on the criteria for the division of marital property and where maintenance has been awarded, the criteria for an award of maintenance. 750 ILCS 5/503(j)(2) (West 2010). The criteria include the property awarded to each spouse, their incomes and present and future earning capacities and "any other factor that the court expressly finds to be just and equitable." See 750 ILCS 5/503(d), 504(a) (West 2010). The spouse seeking the contribution must establish his or her inability to pay and the other spouse's ability to pay. *Schneider*, 214 Ill. 2d at 174; but see *In re Marriage of Haken*, 394 Ill. App. 3d 155, 162 (2009) (disagreeing with *Schneider* that a contribution award requires that a spouse prove the inability to pay). A party has the financial inability to pay attorney fees if the payment of the fees would strip that party of his or her means of support or undermine the party's financial stability. *Schneider*, 214 Ill. 2d at 174.

¶ 114                          a. Contribution From Sunil to Amy's Attorney Fees

¶ 115    Amy contends that the trial court erred when it found that she had the ability to pay her own attorneys. She points out that in its judgment, the court acknowledged the disparity in the incomes of the parties and that Sunil had a better opportunity than Amy in the acquisition

-18-

of assets and income. Amy maintains that, in denying her request for contribution from Sunil, the court focused on Amy's conduct which it found increased the amount of the attorney fees, rather than on the parties' financial situations.

¶ 116    In this case, Amy was awarded a larger percentage of the parties assets, was not required to pay child support, and was awarded the sum of $210,000 in maintenance in gross, which will provide her with a monthly income of $7,000, in addition to her own income. In addition, Sunil had paid her $6,000 per month in support since February 2009, and the payments continued after June 2009, when she no longer had temporary custody of the children. Both Amy and Sunil have large amounts of attorneys fees to pay. While Sunil's income is substantially larger than Amy's, with her educational background, she has the potential to lessen the discrepancy between their respective incomes.

¶ 117    Moreover, it was proper for the trial court to consider Amy's conduct in determining whether to order Sunil to contribute to her attorney fees. Unnecessarily increasing the cost of litigation is a relevant factor in both the division of property and the allocation of attorney fees. *Haken*, 394 Ill. App. 3d at 161 (section 503 allowed the court to consider the unnecessary increase in attorney fees in determining a fee award under section 508(a); see *Mantei*, 222 Ill. App. 3d at 942 (court refused to make a contribution award where the parties' refusal to compromise resulted in the high amount of attorney fees).

¶ 118    We conclude that the trial court's denial of Amy's request for a contribution to her attorney fees from Sunil was not an abuse of discretion.

¶ 119                              b. Contribution to Sunil's Attorney Fees

¶ 120    Amy contends that the trial court erred when it ordered her to contribute to Sunil's fees. In ordering Amy to contribute to Sunil's attorney fees, the trial court considered section 508(b) of the Act.

¶ 121    Section 508(b) provides in pertinent part as follows:

"In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party. If non-compliance is with respect to a discovery order, the non-compliance is presumptively without compelling cause or justification, and the presumption may only be rebutted by clear and convincing evidence. If at any time a court finds that a hearing under this Section was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation." 750 ILCS 5/508(b) (West 2010).

¶ 122    The trial court found that Sunil was able to pay his own fees but was entitled to contribution from Amy in the amount of attorney fees Sunil incurred as a result of Amy's conduct. The court ordered Amy to contribute $60,035.50 to Sunil based on the following acts: failing to comply with discovery; making false physical and sexual abuse allegations;

publishing mental health information; attending a children's event unsupervised in violation of the court's orders; and filing *pro se* motions without leave of court in violation of the court's order. The contribution amount also included the amount Amy was previously ordered to pay in connection with the cancellation of the February 16, 2010, depositions.

¶ 123    Amy maintains that section 508(b) required the trial court to find that she intentionally violated an order and that the violation was without compelling cause or justification before the trial court could require her to contribute to Sunil's attorney fees. She points out that the trial court never made such a finding. She admits that there may have been "technical violations" on her part, but they were unintentional.

¶ 124    Nothing in section 508(b) requires a finding that the violations were intentional. In any event, Amy's arguments are rendered meritless by the evidence in the record.

¶ 125                                    c. Discovery

¶ 126    Amy maintains that she made reasonable efforts to comply with the discovery requests and points out that she did provide documents, affidavits of compliance and a witness list. She asserts Sunil's claim that her compliance was inadequate is at issue. We disagree.

¶ 127    Amy's claim that she made reasonable efforts to comply with the discovery requests is belied by the record. Her attorneys testified as to her reluctance to produce the necessary documents to comply with discovery requests. As a result, the trial court found her submissions incomplete. Despite the trial court granting her extensions to comply with discovery and continuances of the trial date, Amy filed her updated witness list a month after the list was due. The submission of the list, which increased the number of witnesses from 2 to 34, was not only untimely but incomplete since it failed to identify the opinions of the expert witnesses.

¶ 128    In upholding the imposition of sanctions in *Patel I*, this court noted "[Amy's] past dilatory conduct with respect to discovery compliance" and that she failed to "offer any explanation or justification for her tardy submission on appeal, nor does any such explanation appear from the face of the record." *Patel I*, 2011 IL App (1st) 111407-U, ¶¶ 85, 90. While in this appeal Amy placed the blame for the failure to comply with discovery on her attorneys, the record established that Amy's conduct in refusing to cooperate or communicate with her attorneys was responsible for the noncompliance with discovery.

¶ 129                               d. Abuse Allegations

¶ 130    Amy maintains that she was only trying to protect her children when she reported the allegations of Sunil's abuse. She points out that Dr. Amabile concluded that she was not deliberately lying when she made the reports.

¶ 131    Amy's argument that she was only trying to protect her children in accusing Sunil of abuse is belied by her conduct in this case. The uncontradicted evidence revealed that Amy "coached" the children to make false allegations against Sunil. Even after the investigation by DCFS concluded that there was no basis for the allegations of abuse against Sunil, Amy continued to urge her attorneys to pursue the abuse claims.

¶ 132                          e. Violation of Court Orders

¶ 133    Amy argues that she did not violate the court's June 17, 2010, order, barring her from using Dr. Chapman's report at trial. She acknowledges that she quoted from Dr. Amabile's report in the motions she filed *pro se* and that she attached Dr. Chapman's report to a motion. She argues that attaching the report to the motion did not violate the order barring her from using the report at trial.

¶ 134    In its June 30, 2010[8] order, the trial court found that Amy filed Dr. Chapman's report with the clerk of the court, even though she was present when the court entered the June 17, 2010, order. The court further found that "[Amy's] conduct by filing these motions is not innocuous and contains confidential Mental Health Records information and records. [Amy] violated the June 17, 2010, court order by her filing the barred report."

¶ 135    In its June 30, 2010, order, the trial court stated that it questioned Amy in open court about her conduct in filing her *pro se* motions. The record does not contain a transcript of the June 30, 2010 hearing. As the appellant, Amy bears the burden of furnishing a sufficient record to support her claim of error. *Han v. Holloway*, 408 Ill. App. 3d 387, 396 (2011). Any doubt arising from the lack of the transcript is resolved against the appellant. *Han*, 408 Ill. App. 3d at 396. "[U]nless the record indicates otherwise, the reviewing court presumes that the trial court heard sufficient evidence to support its decision." *Compton v. Country Mutual Insurance Co.*, 382 Ill. App. 3d 323, 331 (2008); but see *Muellman-Cohen v. Brak*, 361 Ill. App. 3d 52 (2005) (although there was no transcript of the hearing, in light of the absence of the basis for the disqualification and the seriousness of that issue, the court would not presume the trial court's disqualification of the plaintiff's attorney was in conformance with the law).

¶ 136    In the absence of the transcript, we must assume that the trial court's questioning of Amy revealed sufficient evidence to support its finding that she had revealed confidential mental health information and violated its June 17, 2010, order.

¶ 137    Amy maintains that she did not intentionally violate the June 30, 2010, order that she obtain the court's permission before she filed any more documents, pleadings or motions. She states that the trial court refused to clarify the procedure for obtaining the court's permission to file her *pro se* motions, and that she tried to comply with the order as best she could.

¶ 138    Amy's attempt at compliance consisted of writing at the top of her *pro se* motions that she was seeking the express permission of the trial court to file them. We realize that Amy was not an attorney, but the trial court had instructed her that by representing herself, she would be held to the basic standards of litigation. The trial court did not refuse to clarify the procedure for her; it did properly refuse to instruct her how to practice law. Moreover, at the time she filed her *pro se* motions, she was still represented by the Coladarci attorneys and

---

[8]Amy refers to the June 30, 2010, order as the June 25, 2010, order, which was entered *nunc pro tunc* June 25, 2010.

-21-

could have easily inquired from them how to obtain the court's permission to file motions.

¶ 139      Amy maintains that she did not violate the court's June 26, 2009, order that her contact with the minor children be supervised. Amy argues that her unsupervised attendance at a school orientation program did not violate the order because she did not have any contact with the children. She cites the testimony of a teacher, who was present at the school orientation, that she did not observe Amy have any contact with Elizabeth. However, in his affidavit filed in support of his October 2, 2009, petition to find Amy in indirect criminal contempt of court, Sunil averred that Amy attended the school orientation without the visitation supervisor and that he observed her sitting next to Joseph and whispering in his ear. Based on the trial court's finding that Sunil was a credible witness, the trial court's determination that Amy violated the June 26, 2009, order was supported by the evidence.

¶ 140                      f. Continuance of the February 16, 2010, Depositions

¶ 141      Amy points out that the February 16, 2010, order required Sunil's attorney to send a bill to Amy's attorney for the costs and fees incurred in rescheduling the depositions of Amy's family members. Amy maintains that she never received a copy of the bill for the costs and fees until it was tendered as an exhibit at the hearing on contribution and fees. In addition, Amy appears to suggest that Sunil's attorney should have agreed to a continuance in view of Amy's retaining of new counsel, which would have limited the fees to $500 instead of the $4,688.50, awarded by the trial court.

¶ 142      The February 18, 2010, order acknowledged that Sunil's attorney had tendered the bill to Amy's attorney and that Amy was ordered to pay the bill at the pretrial conference on March 3, 2010. When, at the attorney fees hearing, Amy claimed that she had not seen the bill before, attorney Panos confirmed to the court that she tendered a copy of the bill to the Coladarci attorneys, who were then representing Amy. There is nothing in the record indicating any objection by Amy or her attorneys to the amount of the fees and costs. Amy's suggestion that Sunil's attorney should have agreed to the continuance of the depositions is unpersuasive, especially in light of the fact she had fired the Pasulka firm immediately prior to the scheduled depositions. In addition, this was the third time that Amy had retained new counsel, which resulted in further delays as her new attorneys had to be brought up to date on the status of the case.

¶ 143      Under section 508(b), where the trial court finds that the party's failure to comply with an order was without compelling cause or justification, the court is required to award attorney fees to the other party. *In re Marriage of Harrison*, 388 Ill. App. 3d 115, 119 (2009). The evidence detailed above demonstrates that with regard to her failure to fulfill discovery requests and her abuse allegations against Sunil, she lacked both a compelling reason and justification for her conduct. As to her violations of court orders, Amy offers no compelling reason or justification for the violations other than that she tried her best to comply. Even that excuse is undermined by the fact that, despite the number of attorneys available to her, she chose to act without seeking legal advice as to the potential consequences of her actions.

¶ 144      We conclude that the trial court did not abuse its discretion in ordering Amy to contribute to Sunil's attorney fees.

¶ 145                       4. *Child Representative's Fees*

¶ 146       Amy contends that it was an abuse of discretion to order her to pay a larger share of attorney Levin's fee for serving as the child representative. She maintains that she lacks the ability to pay a disproportionate amount of the fees because of her present financial and employment situation and that Sunil has the greater ability to pay.

¶ 147       In determining the proper allocation of the fees and costs of the child representative, the trial court considers the total circumstances of both parents, including their financial resources and relative ability to pay. *McClelland v. McClelland*, 231 Ill. App. 3d 214, 228 (1992). The facts must establish one party's greater ability to pay and the other party's inability to pay the fees. *Imes v. Imes*, 52 Ill. App. 3d 792, 797 (1977). A party has the financial inability to pay attorney fees if the payment of the fees would strip that party of his or her means of support or undermine the party's financial stability. *Schneider*, 214 Ill. 2d at 174.

¶ 148       Courts have also consider whether the amount of attorney fees was the result of the actions of one or both of the parties. In *In re Marriage of Kramer*, 211 Ill. App. 3d 401 (1991), the reviewing court upheld a trial court order requiring the mother to pay 50% of the fees for the minor child's court-appointed attorney. While the court agreed that the father had the greater ability to pay the fees, the allocation of the fees was not an abuse of discretion since the mother's "actions were the cause of a substantial portion of the litigation." *Kramer*, 211 Ill. App. 3d at 413. In *McClelland*, the mother had caused a substantial portion of the postdecree custody litigation by interfering with visitation with the minor child and by charging the husband with sexual abuse and satanic cult practices, which she failed to substantiate with evidence. While both parties had the equal ability to pay, the reviewing court found no abuse of discretion in requiring the mother to pay $11,615 and the father to pay $5,807 of the minor's attorney fees. *McClelland*, 231 Ill. App. 3d at 228-29.

¶ 149       Amy's reliance on *In re Marriage of Kennedy*, 94 Ill. App. 3d 537 (1981), is misplaced. In *Kennedy*, the trial court ordered the mother to pay $3,000 of the $3,575 in fees awarded to the attorney for the minor children. On appeal, the reviewing court determined that the apportionment of the fees was an abuse of discretion where the husband had the greater ability to pay the fees and ordered the husband to pay the entire amount. Unlike the present case where attorney Levin was appointed following Amy's charges of abuse against Sunil, the trial court in *Kennedy* appointed the attorney for the children when the case went to trial. While the mother in *Kennedy* sought to stay the custody order, there was no evidence that she engaged in conduct that resulted in an unnecessary increase in the amount of fees charged by the minor children's attorney as did the mothers in *McClelland* and *Kramer*. In addition, the reviewing court noted that the trial court initially had ordered the husband to pay the entire fee, and there had been no change in the parties' circumstances that would have supported the modification of the original order. *Kennedy*, 94 Ill. App. 3d at 549.

¶ 150       Amy also relies on *In re Custody of McCuan*, 176 Ill. App. 3d 421 (1988). In that case, the reviewing court reversed an order awarding custody of the minor child to the paternal grandparents and an order requiring the mother to pay 50% of both the guardian *ad litem*'s fees of $2,692.50 and the psychologist's fees of $1,049.85. The court found that the order

was an abuse of discretion where a substantial financial disparity existed between the grandparents, who had income from two jobs, and the mother who was unemployed and had no assets. *McCuan*, 176 Ill. App. 3d at 427-28.

¶ 151    In contrast to Amy's circumstances, in *McCuan*, the mother divorced the father after he was sent to prison. After the divorce was granted, the father petitioned for the appointment of the guardian *ad litem* to protect the minor child's interest in the custody dispute between his parents and the mother. While not finding her unfit, the trial court described the mother as "[totally] lawless, almost totally depraved, unambitious, and dishonest." *McCuan*, 176 Ill. App. 3d at 424. Amy does not lack for assets and has far more employment potential than the mother in *McCuan*.

¶ 152    Finally, Amy argues that requiring her to pay the $23,820.15 in addition to the other debts and fees she has been ordered to pay would require her to liquidate and expend nearly all the marital assets she was awarded. Amy was awarded $592,958.18 in nonretirement assets and $146,784.09 in retirement assets. She was ordered to pay $188,093.12 to the various law firms that had represented her and to contribute $60,035.50 to Sunil's attorney fees for a total of $248,128.62. Together with attorney Levin's fees, her credit card debt of $45,000 and the $170,000 her father loaned her, Amy maintains she was required to pay $486,948.77.

¶ 153    We have upheld the trial court's finding that the $170,000 Amy received from her father was a gift to Amy rather than a loan which Amy must repay. While Amy claimed $45,000 in credit card debt on her disclosure forum, she then testified that she owed $50,000. The trial court found that Amy's testimony was not credible and her disclosure statement was inaccurate. Therefore, the amount established by the evidence that Amy is responsible for paying is $271,948.77. Moreover, in addition to the award of nonretirement assets, Amy is receiving $7,000 per month for 30 months as maintenance in gross. Sunil will be paying the majority of the children's expenses, and at the present time, Amy is not required to pay child support.

¶ 154    While Sunil may have the greater ability to pay fees, the record does not establish that Amy is financially unable to pay the fees. Considering the record in this case, we cannot conclude that no reasonable person would agree with the order requiring Amy to pay $23,820.15 of attorney Levin's fees. Therefore, the trial court's order was not an abuse of discretion.

¶ 155                            5. *Supervised Visitation Fee*

¶ 156    Amy contends that the trial court erred when it ordered her to pay the cost of the professional supervisor who would oversee Amy's visitation with the children. She maintains that the expense is part of the child support obligations under section 505 of the Act and must be allocated based on the best interest of the child and the relative abilities of the parents to

pay for such an expense.[9] Sunil responds that supervised visitation is necessitated by Amy's mental disorder. He maintains that he should not have to pay the cost for the supervised visitation in light of Amy's continued denial that she suffers from any mental illness and her refusal to seek treatment. In addition, he is responsible for virtually all of the children's expenses.

¶ 157    "An important aspect of a child's welfare is the relationship between parent and child. It is in the best interest of a child to have a healthy and close relationship with both parents." *Hock v. Hock*, 50 Ill. App. 3d 583, 584 (1977). Section 607(a) provides that the noncustodial parent is entitled to reasonable visitation with the child unless the court finds that visitation with the noncustodial parent would endanger the child. 750 ILCS 5/607(a) (West 2010). See *Hock*, 50 Ill. App. 3d at 584 (a court's primary concern must be for the welfare of the child).

¶ 158    In *Patel I*, this court cited section 607(a) of the Act and noted that "[t]he trial court has broad discretion in fashioning the terms of visitation, and those terms will not be reversed *** absent an abuse of that discretion." *Patel I*, 2011 IL App (1st) 111407-U, ¶ 111 (citing *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 621 (2007)). In light of the evidence of supporting the conclusion that Amy posed a danger to the children, we found no abuse of discretion by the trial court's order that Amy's visitation with the children must be supervised. *Patel I*, 2011 IL App (1st) 111407-U, ¶ 112.

¶ 159    On the issue of the allocation of the cost of the supervised visitation, a comparison with *Hock* is instructive. Following the parties' divorce, the mother and minor child moved to Missouri. The father was allowed visitation whenever the child was in Missouri or Illinois. After the father lost his eyesight, he was unable to drive or work. He petitioned the court to modify the visitation order to provide that the minor child be sent to him for two weeks during the summer. The trial court denied the modification, and the father appealed. On review, the court reversed, finding that the trial court had abused its discretion. The court found that the trial court's recommendation that the father visit the child in Missouri to show he was sincere in establishing a relationship was improper because it indicated that the court was punishing the father for his past inattentiveness to the child. The court also rejected placing the expense of such a visit on the father, in light of his limited financial resources. In order for there to be a relationship between the child and the father, the court determined that the child must come to visit him in Illinois. *Hock*, 50 Ill. App. 3d at 584-85.

¶ 160    Amy's main argument is that she cannot afford to pay the monthly $2,100 supervision

---

[9]The cases relied on by Amy involve expenses for the children. See *In re Marriage of Florence*, 260 Ill. App. 3d 116 (1994) (father ordered to pay for clarinet for the child in addition to periodic child support payments); *In re Marriage of Vendredi*, 230 Ill. App. 3d 1061 (1992) (child support and educational expenses); *Osborn*, 206 Ill. App. 3d 588 (in determining amount of child support, the trial court considered that the father was responsible for the cost of transporting the children and himself for visitation); and *In re Marriage of Serna*, 172 Ill. App. 3d 1051 (1988) (day-care expense). In the present case, it is Amy's mental health condition that requires the supervised visitation, not the children's.

fee.[10] Amy was awarded $7,000 per month for 30 months. She failed to provide documentation or credible testimony to support her claimed expenses. The court also took into account that Sunil was paying all the other expenses for children. In addition, the trial court did not order a specific amount to be paid for the supervised visitation; the only requirement was that it be a professional visitation supervisor. This allows Amy the opportunity to seek out a professional visitation supervisor she could better afford. Unlike the court in *Hock*, we cannot conclude that Amy is unable financially to pay the cost of supervised visitation.

¶ 161    Moreover, unlike the father in *Hock*, Amy controls the duration and thus the cost of the supervised visitation. The April 15, 2011, custody judgment provided in pertinent part as follows:

> "a. Should Amy seek to have unsupervised visitation, the following must occur:
>
> i. Amy must be in regular treatment with a board certified psychiatrist who has expertise in the area of delusional disorders and who has access to Dr. Amabile's and Dr. Dinwiddie's reports; and
>
> ii. Amy must be evaluated by a board certified psychiatrist selected by the Court at her sole cost. The evaluator shall be asked to determine whether there is a continued risk of harm to the children should Amy have unsupervised visitation. If the parties are not in agreement with the recommendations of the evaluator, a hearing must be held before any change to the current visitation order shall be made."

¶ 162    Certainly it is in the best interest of the children to have a warm and close relationship with both Amy and Sunil. By recognizing and obtaining the necessary treatment, not only will Amy no longer be obligated for the cost of supervised visitation, she will be acting in the best interest of her children.

¶ 163    We conclude that the trial court did not abuse its discretion by ordering Amy to pay the cost of the supervised visitation.

¶ 164                                          CONCLUSION

¶ 165    The judgment of the circuit court is affirmed.

¶ 166    Affirmed.

---

[10]According to Amy, prior to the entry of the judgment the parties paid $2,100 per month for her supervised visitation: Sunil paid two-thirds and Amy paid one-third of that amount.