*In re* MARRIAGE OF RUTH KRAMER, n/k/a Ruth Goran, Petitioner-Appellant and Cross-Appellee, and TOBY KRAMER, Respondent-Appellee and Cross-Appellant (Susan C. Haddad, Appellee).

First District (4th Division)   Nos. 1—89—0973, 1—89—1806, 1—89—2887, 1—89—3040 cons.

Opinion filed March 14, 1991.—Rehearing denied April 11, 1991.

402

Herbert A. Glieberman, of Herbert A. Glieberman & Associates, and Greenburg & Hermann, both of Chicago, for appellant.

Robert H. Hirsch, of Chicago, for appellee Toby Kramer.

Paul J. Bargiel, P.C., of Chicago, for appellee Susan C. Haddad.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

These cross-appeals stem from a petition brought by the respondent Toby Kramer requesting that custody of the parties' son, Adam Kramer, be changed from the petitioner, Ruth Goran, to the respondent. Custody had been originally awarded to the petitioner pursuant to a family settlement agreement which was incorporated into the divorce decree. Following a trial on the petition, the trial court ordered a change of custody from the petitioner to the respondent. The petitioner has appealed this order on the grounds that it was against the manifest weight of the evidence. The petitioner also contends that a judgment of indirect criminal contempt against her must be reversed for lack of sufficient evidence and that the court abused its discretion in determining child support and in apportioning attorney fees. The respondent has cross-appealed from the denial of his request that the

petitioner be ordered to pay his attorney fees as well as those incurred by the minor child.

The parties were married on August 18, 1974, and their only child, Adam, was born on December 10, 1979. They were separated in September of 1981 and divorced on May 25, 1982. On September 29, 1982, a family settlement agreement was incorporated into the divorce decree giving Ruth custody of Adam and providing Toby with visitation.

Toby filed his petition for a change of custody on June 25, 1985. The petition alleged that Ruth consistently violated the provisions of the family settlement agreement by refusing Toby visitation and by violating that portion of the agreement which specified that "[b]oth Husband and Wife will use their best efforts to foster the respect, love and affection of the child towards each parent and shall cooperate fully in implementing a relationship with the child that will give the child the maximum feeling of security that may be possible." The petition further alleged that Ruth's denial of visitation necessitated several court orders to enforce Toby's visitation privileges, and that Ruth failed to comply with the terms of those orders. The petition specifically alleged that contrary to Adam's best interest, Ruth "continuously advises [Adam] that [Toby] does not love him and does not care to visit with him" when it was she who had in fact been preventing the visits. The petition requested in part that custody of Adam be given to Toby and that Ruth be required to show cause why she should not be held in contempt of court for her refusal to comply with various court orders.

The trial on Toby's petition for a change of custody involved 60 days of trial testimony covering approximately 6,000 pages of transcript. Essentially, Toby's position at trial was that, contrary to the terms of the family settlement agreement and to Adam's best interest, Ruth did everything in her power to destroy the father-son relationship between Toby and Adam and to eliminate Toby from Adam's life. Toby testified that problems with visitation began immediately after the parties' separation and continued until the time of the proceedings on the petition. Although testimony was presented as to each specific date on which visitation was denied over the course of approximately seven years, it is neither practical nor beneficial to set out the testimony in detail. The record contains numerous instances in which visitation was frustrated because Adam and Ruth were not at home or because Ruth told Toby that Adam was too ill to go on the visit. A court order was entered providing that Toby, a licensed physician, be allowed to examine Adam whenever illness was given as a

reason for canceling a visit. However, Ruth failed to comply with the order, and Toby was never allowed to examine Adam to verify a claim of illness. Toby testified that his requests for make-up visits were either denied or that Ruth imposed conditions that made the dates unacceptable.

Toby testified that Ruth consistently denied him telephone access to Adam despite a court order providing specific days and times for such access. Toby stated that he would leave messages on an answering machine, but that his calls were rarely returned.

Toby stated that Ruth enrolled Adam in school under the surname Goran, Ruth's maiden name, and refused to give Toby any information about the school. Toby discovered where Adam was enrolled by calling all of the private schools in the area. Toby then testified to a number of ways in which Ruth interfered with the relationship between Adam and him. In addition to changing his surname, Ruth told Adam that the divorce meant that Toby was no longer his father; Ruth told Adam that her husband, Fred Dry, was his "daddy"; Ruth denigrated Toby in front of Adam; and she engaged in behavior during the transfers which was calculated to make Adam feel that he was entering a dangerous situation when he visited with Toby and his wife, Susan Kramer. Toby stated that Ruth would call Adam during the visits and tell him not to worry because he would be coming home soon. Also, she gave him small gifts that were to be opened each day during extended visits.

Two employees of Legal Social Work, Ltd., Linda Hansen and Michelle Leonardi, testified concerning the difficulties with transfers, visitation and telephone access. The agency had been appointed by the court to monitor visitation. Hansen testified that at times Ruth would cancel a visit without giving any reason. When Ruth claimed that Adam was ill, she would not allow Toby to examine the child pursuant to the court order. Leonardi testified that Ruth attempted to involve Adam in her complaints against Toby and his wife. Leonardi testified to the excessively protective behavior exhibited by Ruth and her family when Adam was leaving for and returning from visits. According to Leonardi, Ruth and members of her family would escort Adam to the car, holding his hands, when he left for a visit. On one occasion Leonardi brought Adam home 15 minutes late because of traffic problems. Ruth, her parents, Fred Dry and Ruth's sister and brother-in-law were waiting in front of the house. When she saw the car pull up, Ruth ran across the street letting out short screams. She cradled Adam in her arms telling him how much she missed him and how worried they all were. Leonardi stated that this type of behavior cre-

ated tension in Adam, and she suggested a "buffer zone," which was a five-foot distance in which Adam would walk alone from one parent to the other. Ruth would not comply with the suggestion.

Dr. Bennett Leventhal, the head of child psychiatry at the University of Chicago, was appointed by the court to examine Ruth, Toby and Adam and testified at trial as an expert witness. Leventhal testified that in his opinion it was in Adam's best interest to transfer custody to Toby. Leventhal stated that children of divorced parents are best able to adjust where the following factors are present: free access by the child to both parents; isolation from conflicts between the parents; free access to the child by the noncustodial parent; and no significant economic hardship as a result of the divorce. According to Leventhal, Ruth has not provided Adam with the necessary guidance and support to allow him to develop and sustain a relationship with Toby. Instead, Ruth attempted to eliminate Toby from Adam's life. She inhibited Adam's access to Toby and gave Adam the impression that Toby did not care for him and that Adam was going into an unsafe situation when he visited Toby. Ruth's actions in changing Adam's surname from Kramer to Goran and in representing Fred Dry as Adam's father caused Adam to be confused about his own identity. Leventhal stated that Adam was more anxious than would be expected and that he was not coping successfully with the situation.

Leventhal further testified that by limiting Adam's relationship with Toby, Ruth is compromising her own relationship with Adam. He explained that where one parent is derisive of the other parent's ability to provide for the safety and well-being of the child, the child is put in an untenable situation. He receives the impression that it is not safe to be with, for example, the father, yet the mother whom he trusts is putting him in his father's care. In this situation the child cannot have the trust or confidence that he needs in either parent in order to develop successfully. Leventhal stated that he believed that Toby could and wanted to isolate Adam from Toby's conflicts with Ruth and would be able to allow Adam to sustain a relationship with Ruth. Leventhal admitted that Ruth and Adam had a strong relationship, that the problems with visitation had lessened over time and that his decision to recommend a change of custody was a painful one. Also, he stated that Toby's passive personality might cause a problem in his relationship with Adam. Nevertheless, he believed that the difficulties Adam would suffer as a result of a custody change would be outweighed by the benefits of such a change.

Ruth Goran testified that several scheduled visits with Toby did not take place because Toby did not show up or because he was late.

She admitted that she did not comply with the court order which provided that Toby was to be allowed to examine Adam whenever illness was cited as a reason to cancel a visit. Ruth also admitted that she did not have Adam call Toby at the times provided in the court order, but stated that the telephone was always available for Adam's use. She denied denigrating Toby in front of Adam. According to Ruth, she had a conversation with Adam when he was three years old about changing his surname to Goran. Ruth testified that she was afraid of Toby because he had physically assaulted her from time to time. Much of Ruth's testimony directly contradicted that of Toby.

Charlotte Glass, the principal of Solomon Schecter Day School, testified that Adam is a normal, appealing, verbal child with many friends. Glass stated that Ruth refused to provide the school with any information concerning Toby. Hollis Rosenberg, the school admissions director, testified that Ruth provided the school with a copy of Adam's birth certificate, but that the corner of the certificate bearing his last name had been turned over when it was copied and could not be read. Ruth informed her that Fred Dry would soon be Adam's father and that she did not have much information about Adam's birth father. Rosenberg stated that Adam did not appear to be an anxious child.

Dr. Michael Partipilo, a psychologist, and Dr. Robert Bussell, a psychiatrist, were retained as expert witnesses by Ruth to evaluate whether a change in custody would be in Adam's best interest. Dr. Partipilo testified that although Adam was upset and angry because of the custody dispute, he was not confused regarding his identity. According to Partipilo, Fred Dry was Adam's psychological father and Adam was not carrying any deeply rooted negative feelings toward Toby. Adam's anxiety is reactive to the custody situation and is not internalized. According to Partipilo, Adam feels closer to Ruth than to Toby. Ruth has not promoted Adam's access to Toby. Partipilo stated that it is difficult for Adam to love someone his mother does not value. However, Partipilo did not believe that Ruth's inability to allow a relationship to exist between Adam and Toby made her an unfit parent. Partipilo stated that Adam's home with Ruth is best for him and that Ruth should retain custody.

Dr. Bussell testified that during his examination of Adam, Adam said that Toby forces him to call Toby "dad" and that Toby and his wife are big liars. Adam said that his mother told him that Toby used to be his father but that he is not his father anymore because of the divorce. Adam also said that he, his mother and Fred Dry called Toby and his wife "jerks," and that the M.D. after Toby's name means

"moronic dope." Bussell stated that under the circumstances Adam was functioning very well and that he was not confused about his relationship with Toby. Bussell testified that Adam liked Ruth more than Toby and that a change in custody would be injurious to Adam. The trauma of the transfer of custody would make Adam dislike Toby. According to Bussell, visitation was becoming less difficult and Ruth was beginning to show less animosity toward Toby.

At the conclusion of the trial, the court granted Toby's petition for a change of custody. The court set forth its findings in a lengthy written opinion. Stating that the demeanor of the witnesses was particularly insightful in this case, the court found Ruth's testimony evasive and untrustworthy. The court then stated:

"In every phase of Adam's relationship with his father, [Ruth] has fostered anger, confusion and turmoil to one purpose and to one purpose only—to destroy every vestige of the relationship.

The gifts, the visits missed, the incidents of the exchanges or visitation, the make-up visits never provided, the telephone calls caught in the vacuum of the unresponsive telephone answering machine, the examinations that never took place, the illness of her and Adam that delayed and frustrated, the orders of court that never were complied with in any real way, if at all and all the other scenarios presented here, have one common thread running through them—the denial of access between a son and his father and thereby destruction and prevention of a fundamental natural human right—the right to a nurturing relationship."

The court acknowledged that the change in custody would be a difficult experience for Adam and that there were "minimal indicia" of recent improvements in visitation, but found that the evidence clearly and convincingly demonstrated that a change of circumstances had occurred warranting a modification of the custody arrangement and that a change of custody would be in the best interest of the child.

The facts concerning the finding of contempt, the award of child support and the allocation of attorney fees will be related in connection with our discussion of those issues.

Ruth has appealed from the order changing custody of Adam from her to Toby on the grounds that it is against the manifest weight of the evidence. She argues that the court failed to make a specific finding of changed circumstances, that the situation regarding visitation had been improving, that the court order did not address the issue of what was in Adam's best interest, and that the evidence

did not show that living with Toby would be an improvement for Adam.

■■ Modification of a custody judgment is governed by section 610(b) of the Illinois Marriage and Dissolution of Marriage Act, which provides as follows:

"The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian *** and that the modification is necessary to serve the best interest of the child. *** The court shall state in its decision specific findings of fact in support of its modification ***." (Ill. Rev. Stat. 1989, ch. 40, par. 610(b).)

Thus, a modification of custody requires clear and convincing evidence that circumstances have changed and that modification is necessary to serve the best interests of the child. (*In re Marriage of Dilley* (1984), 127 Ill. App. 3d 992, 999, 469 N.E.2d 674.) As stated by the supreme court in *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 499, 485 N.E.2d 367, 371, quoting *In re Marriage of Wechselberger* (1983), 115 Ill. App. 3d 779, 786, 450 N.E.2d 1385, 1389:

" 'Section 610(b) reflects an underlying policy favoring the finality of child-custody judgments and making their modification more difficult. Its effect is to create a legislative presumption in favor of the present custodian, thereby promoting the stability and continuity of the child's custodial and environmental relationship which is not to be overturned lightly.' "

The court also stated, however, that once the trial court has determined that the presumption in favor of the present custodian has been overcome, a reviewing court will not disturb that determination unless it was contrary to the manifest weight of the evidence or amounted to an abuse of discretion. (*In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 499, 485 N.E.2d 367.) In reviewing the trial court's determination, deference must be given to the opportunity of the trial court to observe the demeanor of the witnesses and assess their credibility. *In re Custody of Sussenbach*, 108 Ill. 2d 489, 485 N.E.2d 367.

Ruth argues that the trial court failed to make a specific finding that circumstances had changed since the initial award of custody to her. She maintains that no such finding could be made because the problems with visitation existed prior to the family settlement agreement which gave her custody of Adam. Ruth points out that the evi-

dence at trial indicated that the situation regarding visitation had been improving. In connection with this argument, Ruth cites *In re Custody of Ehr* (1979), 77 Ill. App. 3d 540, 396 N.E.2d 87, and *Eggemeyer v. Eggemeyer* (1967), 86 Ill. App. 2d 224, 229 N.E.2d 144, for the proposition that difficulty in enforcing visitation is not a sufficient basis for a modification of custody.

■ In our view, this argument reflects a misunderstanding of the trial court's reasons for changing custody from Ruth to Toby. It was not simply the denial of visitation, or Ruth's decision to change Adam's surname, or any other single factor that prompted the custody change. These factors were simply outward manifestations of what the trial court termed a comprehensive scheme by Ruth to deny Adam any type of relationship whatsoever with his father. When Ruth entered into the family settlement agreement giving her custody of Adam, she agreed that she would use her "best efforts to foster the respect, love and affection of the child" toward Toby. Since that time, as is shown by the evidence at trial, Ruth has done everything in her power to cause Adam to disrespect and dislike his father. Although Ruth denied telling Adam that Toby was no longer his father because of the divorce and further denied making disparaging comments about Toby to Adam, the trial court found her testimony untrustworthy. The court explicitly stated that its observations of Ruth's demeanor were critical to its assessment of her credibility. As a court of review, we must defer to the trial court's superior position to make such observations. Moreover, we are unpersuaded by Ruth's argument that the trial court failed to make a specific finding that a change of circumstances had occurred. Although the court did not recite the exact language of the statute pertaining to custody modification, it set forth extensive, detailed findings of fact supporting its decision to modify custody. This is sufficient to fulfill the requirements of the statute. *In re Custody of Sussenbach* (1985), 108 Ill. 2d 489, 498, 485 N.E.2d 367.

Ruth further argues that the evidence did not support the finding that a change of custody was in Adam's best interest. She asserts that the evidence showed that she was a warm and loving parent, that Adam was a happy, well-adjusted child and that even the court-appointed expert, Dr. Leventhal, testified that a custody change would be a very difficult experience for Adam.

Of the three witnesses who testified at trial, only Dr. Leventhal recommended a change of custody. Dr. Partipilo and Dr. Bussell, although acknowledging Ruth's unwillingness or inability to foster a relationship between Adam and Toby, believed that Ruth was an adequate parent in all other respects and that removing Adam from her

custody would not be in Adam's best interest. They believed that while the custody dispute was causing Adam to suffer some anxiety, the anxiety was a reaction to the situation and was not internalized. Neither Partipilo nor Bussell believed that Adam was confused about his identity or about the fact that Toby was his biological father.

■ In contrast, Dr. Leventhal believed that Adam was overly anxious and definitely confused about his identity. Leventhal stated that Adam was not coping well with the situation and that Ruth, by trying to eliminate Toby from Adam's life, was compromising her own relationship with Adam. It was Dr. Leventhal's opinion that Toby would be better able to isolate Adam from the conflicts between Ruth and Toby and to foster a relationship between Adam and both of his parents. Dr. Leventhal acknowledged that the change of custody would be a very difficult experience for Adam, but believed that the benefits of such a change would outweigh the risks. The trial court found that Dr. Leventhal's report to the court was well developed and well documented, and that his testimony was of considerable assistance. We believe that the court was well within its authority in relying upon Dr. Leventhal's recommendation and the data supporting it as a basis for its determination that a change of custody was in Adam's best interest. Accordingly, we find no reason to disturb the judgment of the trial court changing custody of Adam from Ruth to Toby.

Ruth next contends that the order of June 23, 1989, finding her guilty of indirect criminal contempt of court and sentencing her to 10 days in jail was not supported by sufficient evidence.

The record shows that on May 1, 1989, Toby filed an emergency motion and petition for rule to show cause alleging that Ruth violated paragraph 9 of the court order of January 3, 1989, by failing to provide Toby with an itinerary for Adam during his spring vacation with Ruth. Toby further alleged that Ruth failed to provide for telephone communication as stated in the order. Paragraph 9 of the court order states as follows:

"That Ruth Goran shall provide Toby Kramer with an itinerary along with a telephone number *** where the child can be reached during any visitation that takes place away from Ruth's home. That said telephone number shall not be used by Toby except for emergencies or except on the occasion of the extended summer vacation wherein Ruth Goran shall make the child available and Toby Kramer shall be able to call the child on each Wednesday during such period of visitation *** as set forth in paragraph [8] above."

Paragraph 8 specified the time and duration of the telephone calls.

Ruth filed a verified response to the petition affirmatively stating that Adam spent the spring vacation at her house, not away from home as alleged by Toby. She further stated that the order did not require telephone communication except in an emergency or during the extended summer vacation.

At a hearing on the petition, Toby testified that he did not know whether the spring vacation had occurred away from Ruth's home. He made no attempt to find out whether or not they were home other than telephoning each night. No one answered, and he left messages on the answering machine. Adam attempted to return his call on one occasion and left a message on Toby's answering machine. The trial court found Ruth guilty of indirect criminal contempt and sentenced her to 10 days in jail. The sentence was stayed pending the outcome of this appeal.

■■■ In criminal contempt proceedings, it is necessary that guilt be proved beyond a reasonable doubt. (*O'Leary v. Allphin* (1976), 64 Ill. 2d 500, 512, 356 N.E.2d 551.) Based on that standard, we believe that the judgment of contempt must be reversed. The evidence does not establish beyond a reasonable doubt that the spring vacation took place away from Ruth's home. An itinerary for Adam was to be given only in that instance. Toby admitted that he did not know whether or not the vacation took place away from Ruth's home. His testimony at best established that Ruth did not answer the telephone or return his calls. However, the record shows that throughout the entire course of this litigation the vast majority of Toby's phone calls were not returned by Ruth. Moreover, the court order provided for telephone communication between Toby and Adam only during the extended summer vacation. The judgment of indirect criminal contempt is accordingly reversed.

Ruth next contends that the trial court erred in ordering her to pay monthly child support in the amount of $350 and in ordering her to pay half of the fees and costs owed to Adam's court-appointed attorney. She also maintains that the court erred in finding that the minor child's attorney fees are in the nature of child support and therefore not dischargeable in bankruptcy and in finding that such fees are the joint obligation of the parties. Toby, in his cross-appeal, contends that Ruth should have been ordered to pay all of the fees of Adam's court-appointed attorney as well as his own attorney fees.

Testimony concerning the financial aspects of this cause covered over 500 pages of transcript. At the conclusion of the testimony, the court found that because of a lack of evidence on the subject, no determination of the parties' net income could be made. However,

Ruth's annual gross income was $34,250 and Toby's annual gross income was $356,308. On appeal, Toby claims that this figure is incorrect and contrary to the evidence, but does not cite any specific portion of the record which would support this claim. In ordering Ruth to pay $350 a month in child support, the court noted that the amount was below the statutory guidelines and that Ruth's income was fully supplemented by that of her husband. Ruth was also ordered to pay 50%, or $9,617.50, of the $19,235 fee for Dr. Leventhal's report. She was ordered to pay 50%, or $20,492.05 of the $40,984.10 owed to Adam's court-appointed attorney. The court found that the minor child's fees were in the nature of child support and were the joint obligation of the parties.

■■ ■ With respect to the issue of child support, it is well established that the amount determined by the trial court rests within its discretion and that an abuse of discretion will be found only where no reasonable person would adopt the position of the trial court. (*In re Marriage of Dwan* (1982), 108 Ill. App. 3d 808, 812, 439 N.E.2d 1005.) Ruth claims that the trial court failed to consider both Adam's needs and the disparity between the income of the parties. In support of her position, she cites *In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 547 N.E.2d 590, in which the court held that the trial court's award of child support in the amount of $30,000 per year for a four-year-old was excessive. Unlike the situation in *Bush*, we do not believe that the award of $350 per month reflects a position that no reasonable person would adopt.

■■ Ruth next contends that because Toby's income is so much greater than hers, the court erred in ordering her to pay half of the fees and costs incurred by Adam. As in the case of child support, an abuse of discretion in allowing attorney fees will be found only where it can be said that no reasonable person would adopt the view taken by the trial court. (*In re Marriage of De Bat* (1984), 127 Ill. App. 3d 463, 466, 468 N.E.2d 1348.) The record before us shows that although Toby may be financially better able to pay the fees, the court's award was based in part upon its view that Ruth's actions were the cause of a substantial portion of the litigation. We are not persuaded that the trial court abused its discretion in allocating Adam's attorney fees equally between the parties.

■■ Ruth next argues that the trial court erred in finding that the minor child's attorney fees were in the nature of child support and therefore not dischargeable in bankruptcy and also in finding that the fees were the joint and several obligation of the parties. We find no merit to either of these contentions. In *King v. King* (1978), 57 Ill.

App. 3d 423, 373 N.E.2d 313, the court rejected the husband's argument that his obligation to reimburse his wife a certain amount for attorney fees was discharged by his subsequent bankruptcy. The court stated that "[a]ttorney's fees awarded in a divorce decree have been held to be in the nature of alimony and therefore not dischargeable in bankruptcy." (*King*, 57 Ill. App. 3d at 427, 373 N.E.2d at 315; see also *In re Cornish* (7th Cir. 1976), 529 F.2d 1363.) Here, the trial court found that the expenses incurred on behalf of the child were "in direct relation to the current needs and future well being of the minor child" and were therefore in the nature of child support. This finding was supported by the record.

Also, Illinois law provides that the financial responsibility for the support of a child is the joint obligation of both parents. (*In re Marriage of Rink* (1985), 136 Ill. App. 3d 252, 258, 483 N.E.2d 316; *In re Marriage of Adams* (1981), 92 Ill. App. 3d 797, 802, 416 N.E.2d 316.) Ruth has cited no authority to support her contention that the court erred in finding that Adam's attorney fees were the joint and several obligation of both parents and we accordingly find no merit to that contention.

Finally, Toby in his cross-appeal contends that Ruth should have been ordered to pay all of the attorney fees incurred by him as well as by Adam because the court found that Ruth precipitated the litigation by her misconduct. Although the court did in fact make that finding, we believe that, in light of the financial disparity between the parties it cannot be said that the court's allocation of fees constituted an abuse of discretion.

Accordingly, the judgment of the trial court modifying custody, awarding child support and allocating attorney fees is affirmed; the judgment of indirect criminal contempt is reversed.

Affirmed in part; reversed in part.

JOHNSON and LINN, JJ., concur.