NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210357-U

NO. 4-21-0357

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 18, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF WHITNEY H., | ) ) | Appeal from the Circuit Court of |
| Petitioner-Appellant, | ) | Logan County |
| and | ) | No. 19D20 |
| DANIEL B., | ) | |
| Respondent-Appellee. | ) ) | |
| | ) | Honorable |
| | ) | William G. Workman, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, holding the trial court's decision allocating to the parties joint decision-making responsibilities and allocating to respondent the majority of parenting time does not stand against the manifest weight of the evidence, the trial court did not abuse its discretion by denying petitioner's request for retroactive child support and ordering her to pay child support going forward, and the trial court did not err in denying petitioner's request to permanently relocate the minor child to Indiana.

¶ 2    Petitioner, Whitney H., appeals the trial court's judgment allocating majority parenting time to respondent, Daniel B., and ordering her to pay child support. She also appeals the trial court's decisions denying her retroactive child support and denying her request to permanently relocate the minor child (N.B.) to Indiana. Whitney challenges the trial court's judgment as manifestly unjust because the evidence supported findings that it was in N.B.'s best interest to live with her in Indiana and for her to have sole decision-making responsibilities

relating to N.B. Whitney also attacks the trial court's order denying her petition for retroactive child support and ordering her to pay child support as an abuse of discretion. We disagree and affirm the trial court's judgment.

¶ 3                                              I. BACKGROUND

¶ 4             Whitney and Daniel married on May 6, 2018, in Menard County, Illinois. The couple then established a marital residence in Logan County, Illinois. The marriage produced one child, N.B., born in July 2018. The family lived together in the marital residence until March 2019, when Whitney left with N.B.

¶ 5             On March 8, 2019, following an argument the night before where Daniel was angry and allegedly threatened suicide, Whitney filed a *pro se* petition for an emergency order of protection in Logan County, alleging she feared Daniel might hurt her or N.B. and did not know what he might do. Whitney's petition requested permission to take N.B. to her parents' residence in Newburgh, Indiana. The trial court granted the protection order and allowed Whitney and N.B. to leave the state. Within a few weeks, Whitney filed a petition for dissolution of marriage, claiming irreconcilable differences caused an irretrievable breakdown in the marital relationship. She requested the trial court grant her decision-making responsibilities over N.B. and order Daniel to pay her child support and maintenance.

¶ 6             On March 28, 2019, the trial court entered an "Agreed Temporary Order" whereby the parties agreed Whitney "may temporarily relocate with the minor child to Newberg [*sic*], Indiana, to reside with her parents, Steve and Cathy [H.]" As part of the agreement, Whitney allowed the protection order to expire. The order allowed Daniel to "have supervised parenting time on alternating weekends for a minimum of four (4) hours." The trial court ordered the parties to exchange financial affidavits and participate in mediation.

¶ 7         One month later, Daniel moved to either vacate or modify the agreed temporary order. He alleged his prior attorney coerced him into signing the order. The trial court denied the motion. In July 2019, Daniel again moved to modify the temporary order, alleging Whitney violated the order and she was unstable. Daniel requested primary parenting responsibilities with the majority of parenting time or, alternatively, a joint allocation of parenting responsibilities with 50/50 parenting time and the child residing in Illinois. Whitney countered with a September 2019 "Petition for Temporary Child Support and Interim Attorney Fees" and an October 2019 "Petition to Relocate." Following an October 21, 2019, hearing, the trial court issued a new temporary order. The court found Whitney violated the prior agreed temporary order but reserved the contempt issue for a later date. The trial court granted Daniel unsupervised parenting time on alternating weekends. The matter remained in discovery for a year, until Daniel moved to set a trial date and discovery deadlines.

¶ 8         The trial court held a hearing on the matter on April 12, 2021, where both parties testified and presented evidence. Whitney testified she was born, raised, and educated in Indiana. She moved to Illinois for an internship in 2016 and stayed when she met and married Daniel. Whitney acknowledged she and Daniel shared parenting responsibilities for N.B. in the months they lived together following the birth. Whitney stated she decided not to return to work after having N.B. because she could not find childcare. She then testified she also began looking for jobs but could not find one. Whitney claimed Daniel vacillated on whether she needed to work.

¶ 9         Whitney testified the marriage soon deteriorated as the parties' arguments and disagreements escalated. In October 2018, she and infant N.B. went to her parents' Indiana home because she "needed a break." When she did not return as initially planned, Daniel began calling

and demanding she bring N.B. back home. Whitney and N.B. did return to the marital residence, but the parties' relationship did not improve.

¶ 10　　　　　Whitney testified that on March 7, 2019, she and Daniel argued about her not working. She claimed Daniel threatened suicide, which prompted her to seek a protection order and permission from the trial court to go to her parents' home in Indiana. Whitney admitted she had no intention of staying in Illinois in March 2019. She then stated she had no intention of returning to Illinois so that N.B. could be near his father. At some point after she left the marital residence, Whitney created a GoFundMe webpage wherein she claimed she "fled with my son from an extremely dangerous and violent situation. We had been victims of verbal, emotional, psychological, financial, and physical abuse and the attacks on us escalated to an alarming level during this time." Whitney's webpage claimed: "Because of the abuse I have been left jobless and without enough money to meet our most basic needs ***." On cross-examination, Whitney acknowledged Daniel never hit her. She could not reconcile her statements from her GoFundMe page where she said she was jobless due to abuse with her statements in her petition to relocate which claimed she could not utilize her degree in Illinois or her testimony where she said she did not work due to lack of childcare.

¶ 11　　　　　Concerning her work status, Whitney testified she looked for jobs in Illinois from August 2018 to March 2019, but she could not find a job. She then testified she found a job almost immediately after she moved to Indiana. She recalled she got a job offer the end of March 2019 and began working on April 9, 2019. When asked if she began looking for jobs in Indiana before she left the marital residence, she did not "believe [she] did" but acknowledged "a job search can take you in lots of directions." Whitney testified she is a registered dietician, and her credential is not state-specific. She explained she began the credentialing process while living in

Illinois and finished it when living in Indiana. Whitney stated she could get an Illinois license by paying a fee. Whitney testified she has worked at the same long-term care facility since April 2019. She discussed her work schedule and salary.

¶ 12        Whitney testified N.B. began daycare in April 2019 when she began working. Though she could not find childcare in Illinois during a seven-month search, Whitney acknowledged she found a daycare within a month of moving to Indiana. She stated she chose the daycare facility without consulting Daniel. She indicated to daycare staff that she had a protection order against Daniel, even though she let the order expire as part of the March 28, 2019, agreed temporary order. Whitney testified she alone paid N.B.'s daycare expenses and provided documentation.

¶ 13        Whitney testified about her and N.B.'s life in Indiana. She explained they live near her extended family. She testified they lived with her parents until November 2019. She admitted she did not tell Daniel or the trial court when she and N.B. moved to her current home. She further admitted she did not have the court's permission to change residences. Whitney testified about her finances. She said she and N.B. attended a nondenominational church. She discussed several minor injuries and illnesses N.B. suffered since moving to Indiana. She acknowledged she did not immediately tell Daniel about N.B.'s injuries and illnesses. Similarly, she stated she did not consult with Daniel about N.B.'s medical care. She unilaterally chose a pediatrician in Indiana and did not consider Daniel's insurance coverage. Whitney described communicating with Daniel as "tough in the beginning." Although she said she could not believe anything Daniel said in a text message, she also believed their communication was improving. Whitney acknowledged N.B. only lived in Illinois before she left with him in March 2019. She recalled he was a healthy baby when living in Illinois. She admitted N.B. needs both parents.

Whitney testified about her proposed parenting time schedule and requested sole decision-making authority.

¶ 14 Daniel testified he worked as an Engineering Technician 3 for the Illinois Department of Transportation (IDOT). He said he had held that job for over 10 years. Daniel testified about his education, explaining he held a bachelor of arts degree, he began a master of arts degree in public history, and he began coursework towards a masters of divinity. Daniel discussed his work history, noting he served in the Air Force and Illinois Air National Guard, he worked as a middle school teacher, and he worked with at-risk youth before taking a job with IDOT. He confirmed his prior employers conducted background checks as a condition of employment and he passed all checks. Daniel testified he looked for a second job following N.B.'s birth and sold plasma to help support the household.

¶ 15 Daniel testified he took his allowed four weeks of paternity leave when N.B. was born. He and Whitney shared parenting responsibilities. He stated that apart from Whitney breastfeeding, he exclusively cared for N.B. in the first few weeks because Whitney suffered debilitating headaches. Daniel testified he believed Whitney would return to her job at the Macon County Health Department after maternity leave. He stated Whitney quit her job without discussing it with him. Daniel said he encouraged Whitney to work because they could not live on his IDOT income alone. He claimed he helped Whitney look for jobs and would watch N.B. when she went for interviews. He testified he did not believe Whitney's explanations for why she did not get those jobs. He stated Whitney refused to get a job.

¶ 16 Daniel likewise testified he looked for childcare so Whitney could return to work. He stated Whitney refused to call daycare facilities. Daniel reported he arranged for his landlady to watch N.B. until he could get into a daycare, but Whitney would not allow it. Daniel testified

he had childcare set up for N.B. should the trial court order N.B. to return to Illinois. When confronted with statements in Whitney's petition to relocate claiming she could not use her degree in Illinois and could not find childcare in Illinois, Daniel said he believed those statements were false.

¶ 17       Daniel testified to his concerns about N.B. living with Whitney. He believed N.B.'s injuries and illnesses suggested Whitney was a neglectful parent. He noted Whitney did not communicate with him about N.B.'s health and medical care. He stated he would text Whitney with questions about how N.B. was injured, or how N.B. was feeling, or about doctor's appointments, but often Whitney would not respond to his texts. Daniel testified he heard two-year-old N.B. use profanity in proper context. He believed N.B. heard such language from Whitney and presented text messages where Whitney used profanity. Daniel testified Whitney denied him parenting time and unilaterally changed the visitation schedule. Whitney did not allow Daniel to see N.B. on his first two birthdays or Father's Day.

¶ 18       Daniel testified he did not know Whitney and N.B. moved out of her parents' home until her testimony earlier that day. He likewise testified he only recently learned about N.B.'s daycare when the facility responded to a subpoena. He stated he tried calling the facility to learn about its accreditation and schedule a visit but the facility hung up on him twice.

¶ 19       Daniel testified about his finances. He noted he paid some of Whitney's debts after she left. He did not request reimbursement. He testified he filed for bankruptcy in August 2019 and none of the debts discharged pertained to Whitney. Daniel testified he has two adult children and has experience raising kids. He stated N.B. lived in Lincoln, Illinois, for the first eight months of his life and N.B. was a happy, healthy baby when living with him. He said that when he agreed for N.B. to temporarily live in Indiana, he believed N.B. would be out of the

state for only six months. Daniel asked for sole decision-making responsibility regarding N.B.'s education but joint decision-making responsibility for N.B.'s medical decisions.

¶ 20　　　　After arguments from the parties, the trial court took the matter under advisement. It scheduled a hearing to announce a decision for April 21, 2021, and asked that N.B. be present at the next hearing. That hearing, however, was continued.

¶ 21　　　　The parties reconvened for the trial court's decision on May 17, 2021. The trial court noted it reviewed the admitted exhibits. It dissolved the marriage. As for parenting time, the trial court found both parties "acceptable parent[s]" and both "are probably able to care for the child." It noted "both of the parents love the child equally, but the child's home is here in Illinois. This is where he was born." The trial court "grant[ed] the majority of the parenting time to [Daniel]." The trial court indicated it would reexamine the matter and consider a "joint parenting, 50/50" should Whitney move within a reasonable distance to N.B. and Daniel. The trial court maintained the current visitation schedule, allowing Whitney parenting time on alternating weekends and two weeks during the summer. The trial court allowed the parties to make a holiday schedule.

¶ 22　　　　The trial court's brief oral pronouncement of judgment elicited clarifying questions from the parties. In response to a question from Daniel's counsel, the trial court noted N.B. must be turned over to Daniel that day. The trial court awarded the parents "equal decision making" responsibilities. In response to a question from Whitney's counsel, the trial court denied Whitney's petition for child support. It noted Whitney did not pursue her request for child support and did not submit evidence supporting it until the April 12, 2021, hearing. The trial court twice explained to Whitney's counsel:

- 8 -

"[Y]ou did file on behalf of petitioner a petition for temporary child support and attorney's fees, but at this point I don't believe that the Court is going to order such. One reason, I don't think it would be in an interest of fairness that it was sat on for two years without calling it up and then asking for a lump sum here more than two years down the road—almost two years down the road.

* * *

All right. I understand the argument of the parties at this point; and as I indicated earlier, I don't believe in a fairness issue that sitting on the petition for temporary child support for two years and then all of a sudden coming up and asking for a judgment for that without fully prosecuting it after it was filed back in September of 2019, I don't believe that the Court is in a position that it's going to award any back child support at this point."

¶ 23 On June 15, 2021, the trial court issued a written judgment for dissolution of marriage, detailing the court's oral pronouncement. Besides awarding Daniel the majority of parenting time, the court's order required Whitney to pay Daniel child support amounting to $538.76 per month. The trial court's written order incorporated the allocation judgment and parenting plan, which outlined the decision-making responsibilities and parenting time schedule.

¶ 24 This appeal followed.

¶ 25                                    II. ANALYSIS

¶ 26 Whitney contends the trial court's decisions granting the majority of parenting time to Daniel, granting joint decision-making responsibilities to both parents, and denying her

- 9 -

petition to permanently relocate stand against the manifest weight of the evidence. She argues the evidence supported her having the majority of parenting time and her having sole decision-making responsibilities regarding N.B.'s education and healthcare. Whitney finally argues the trial court abused its discretion in denying her request for retroactive child support and ordering her to pay child support going forward. We disagree on all points.

¶ 27                                    A. Allocation of Parenting Responsibilities

¶ 28        Determining parenting time and allocating decision-making authority are matters within the sound discretion of the trial court. *In re G.L.*, 2017 IL App (1st) 163171, ¶ 24, 80 N.E.3d 636. Sections 602.5 and 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/602.5(a), 602.7(a) (West 2020)) govern these determinations and provide that trial courts must allocate these parental responsibilities according to the child's best interest. Though the statutes outline relevant considerations, "[a] determination of the best interests of the child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." *In re Marriage of Eckert*, 119 Ill. 2d 316, 326, 518 N.E.2d 1041, 1045 (1988).

¶ 29        " 'In child custody cases, there is a strong and compelling presumption in favor of the result reached by the trial court because it is in a superior position to evaluate the evidence and determine the best interests of the child.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64, 92 N.E.3d 1070 (quoting *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 25, 991 N.E.2d 944); see also *In re Marriage of Spangler*, 124 Ill. App. 3d 1023, 1028, 464 N.E.2d 1120, 1123-24 (1984) (stating the "strong and compelling" presumption in child custody cases). Witness credibility can play a large part in custody determinations. See *In re Marriage of Spent*, 342 Ill. App. 3d 643, 652, 796 N.E.2d 191, 199 (2003) ("Because the trial court [sits] in a far

better position to 'observe the temperaments and personalities of the parties and assess the credibility of the witnesses,' the reviewing court affords great deference to the trial court's best interests findings." (quoting *In re Marriage of Stopher*, 328 Ill. App. 3d 1037, 1041, 767 N.E.2d 925, 928-29 (2002))). We will not reverse a trial court's allocation of parenting responsibilities (*i.e.*, parenting time and decision-making authority) unless it goes against the manifest weight of the evidence. *Young*, 2018 IL App (4th) 170001, ¶ 56. "A [decision] is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Young*, 2018 IL App (4th) 170001, ¶ 56.

¶ 30         Whitney's challenge to the trial court's decision allocating the majority of parenting time to Daniel and joint decision-making authority to both parents rests on multiple grounds. She first argues the trial court's limited "findings of fact were unreasonable[,] arbitrary[,] or not based on evidence." We agree the trial court made limited findings. It found the following:

> "I don't find either parent to not be an acceptable parent in this case. I think both of the parents love the child equally, but the child's home is here in Illinois. This is where he was born. He was taken out of the state and was with his mother since the filing of the order of protection ***.
>
> *** [T]he mother is living in Indiana and the father is living here and remains here where the marital home—marital residence was and also where the young man was born ***.

Like I said, both parents I feel are probably able to care for the

child; but because of the distance that [Whitney] lives, that's not a

possibility at this time."

While we agree these are sparse findings, they are not unreasonable, arbitrary, or not based on

evidence presented to the trial court. The record evidence is clear—N.B. was born in Illinois and

lived here until his mother received permission from the father to temporarily relocate him in

March 2019. Whitney currently lives about four hours from the marital residence. Those findings

are based on evidence and are not unreasonable or arbitrary. The record further shows each

parent testified they shared parenting responsibilities when they lived together in Illinois and

N.B. was a healthy, happy baby when he lived here. Since the parents separated, both have

parented N.B. and, apart from what appear to be minor injuries, he has done well when in

Whitney's or Daniel's care. The evidence, therefore, does support reasonable findings that

Daniel and Whitney equally love N.B., both are acceptable parents, and both are able to care for

N.B. Because the trial court sat in the best position to judge the evidence, we defer to its

findings. See *Young*, 2018 IL App (4th) 170001, ¶ 64.

¶ 31         We note Whitney selectively plucks statements by the trial court about documents

in the record (namely, a holiday schedule, financial affidavits, and requests for 50/50 parenting

time) she contends are inaccurate and argues "[t]hese clearly erroneous findings of facts should

cause this Court great pause in granting any deference to the Trial Court's findings." We take her

concerns in turn. The trial court could not recall seeing Whitney's proposed holiday schedule,

but it allowed the parties to collaborate on a schedule. This was not a factual finding, however. It

was a comment about the adequacy of the record. The trial court then misspoke when it indicated

both parents requested 50/50 parenting time. But the court did not make that statement as a factual finding. It was made within the context of being "open to reexamining the parenting time should [Whitney] move within a reasonable distance of the son." Finally, we note the trial court's statement, "I don't know that we had the affidavits to determine what the appropriate [child] support should have been," is also not a factual finding. Whitney rightly acknowledges the parties were ordered to exchange financial affidavits, but she directed our attention to her proposed "Support Obligation Worksheet" contained at pages 40 and 41 in the common law record. The record contained financial affidavits along with these worksheets. Perhaps the trial court misspoke or confused the title of the financial documents in the record. More importantly, though, the trial court made the financial-affidavit comment in the context of noting how Whitney did not actively pursue her request for child support. It was not a factual finding. All told, these statements from the trial court are not "clearly erroneous," and they give us zero pause in deferring to the trial court's factual findings. Though the trial court made few factual findings, those findings were based on the evidence and were not unreasonable or arbitrary. See *Young*, 2018 IL App (4th) 170001, ¶ 64.

¶ 32        Whitney next argues "the trial court failed to apply the law to the facts in determining the best interests of [N.B.]" because it "did not mention any statutory factors" from the Dissolution Act when rendering its decision. Indeed, when allocating parental responsibilities (parenting time and decision-making), the trial court did not expressly name the Dissolution Act, nor did it explicitly discuss the best-interest factors laid out in sections 602.5(c) and 602.7(b). However, "[t]he trial court is not required to make specific findings regarding each section 602 factor as long as evidence was presented from which the court could consider the factors prior to making its decision." *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 79, 667 N.E.2d 1094, 1099

(1996). See also *G.L.*, 2017 IL App (1st) 163171, ¶ 43 ("Although a trial court must consider all relevant factors when determining the best interests of a child, it is not required to make an explicit finding or reference to each factor."); *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47, 165 N.E.3d 501 ("The circuit court is not required to make explicit findings on each factor, nor is it required to refer to every factor."). "Generally, we presume that a trial court knows the law and follows it accordingly." *G.L.*, 2017 IL App (1st) 163171, ¶ 43.

¶ 33    Even though the trial court did not explicitly reference each best-interest factor in the Dissolution Act, its evidence-based findings implicitly correlated with some statutory factors. Both section 602.5(c)(8) and section 602.7(b)(8) of the Dissolution Act require the trial court to consider the child's needs. 750 ILCS 5/602.5(c)(8), 602.7(b)(8) (West 2020). Based on the evidence presented, the court noted both parents were acceptable parents and could care for N.B. and meet his needs. There was no evidence presented from either party that N.B. has unique needs that only one parent can meet. Both section 602.5(c)(9) and section 602.7(b)(9) require the trial court to consider "the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement." 750 ILCS 602.5(c)(9), 602.7(b)(9) (West 2020). There was copious evidence in the record documenting Whitney's decision to move four hours from the family home in Illinois. She testified she never had any intention to return to Illinois when she left the state in March 2019. The trial court twice referenced the distance between Daniel's and Whitney's homes, noting Whitney moved to Indiana and that distance made equal parenting time unreasonable. Similarly, the trial court's decision allocating parenting time obliquely referenced section 602.7(b)(4), "any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child," because it maintained the prior visitation

schedule, only changing which parent had the majority parenting time. 750 ILCS 5/602.7(b)(4) (West 2020). The trial court deemed N.B.'s birth and life in Illinois until age eight months a relevant best-interest factor. Sections 602.5(c)(15) and 602.7(b)(17) mandate that a trial court shall consider "any other factor that the court expressly finds to be relevant." 750 ILCS 602.5(c)(15), 602.7(b)(17) (West 2020). Although the trial court did not explicitly discuss the best-interest factors, we presume it knew and followed the law. *G.L.*, 2017 IL App (1st) 163171, ¶ 43. A careful reading of the court's decision and the relevant statutes indicates the trial court did consider and then apply the relevant law to the facts of this case.

¶ 34            Whitney's final arguments challenging the trial court's allocation of parental responsibilities go hand-in-hand. She argues, on the one hand, the trial court's decision giving Daniel the majority of the parenting time and giving both parents decision-making authority goes against the manifest weight of the evidence. On the other hand, Whitney argues the evidence and the statutory factors "overwhelmingly support [N.B.] residing primarily with [her] in Indiana." We note first that given the standard of review, "[i]t is no small burden to show that a circuit court's ruling on [parental] responsibilities is against the manifest weight of the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 50. Whitney's arguments do not carry that burden.

¶ 35            The trial court's allocation of parental responsibilities does not stand against the manifest weight of the evidence because its findings and conclusions are not unreasonable or arbitrary. *Hefer*, 282 Ill. App. 3d at 80. In other words, considering the record evidence, it is not apparent to us that the trial court should have reached the opposite conclusion (allocating the majority of parenting time to Whitney and allocating to her sole decision-making responsibility). *Hefer*, 282 Ill. App. 3d at 80. There was evidence that Daniel is a capable parent who can provide for N.B.'s needs. Likewise, there was evidence that N.B. did well when he lived with

Daniel on a full- or part-time basis. The court placed emphasis on N.B. being born in Illinois, living here for the first eight months of his life, and his home being in Illinois. Implicit in such a finding was the fact the minor child was not yet three years of age and had not started school. We will not question the weight the trial court placed on that factor since the Dissolution Act grants the trial court discretion to consider any factor it "expressly finds to be relevant." 750 ILCS 5/602.5(c)(15), 602.7(b)(17) (West 2020). This is not to say there was not evidence favorable to Whitney's position. There certainly was. However, we cannot "reweigh the evidence *** and set aside the circuit court's decision simply because a different conclusion *may have been drawn* from the evidence." (Emphasis added.) *Jameson*, 2020 IL App (3d) 200048, ¶ 51. To be sure, "[w]here the evidence permits multiple inferences, we will accept those inferences that support the trial court's order." *G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 36        The trial court heard testimony from Whitney and Daniel, and throughout the proceedings, it observed their demeanor on the witness stand and in the courtroom. The parties sometimes gave conflicting testimony. Custody matters can turn on credibility. See *Spent*, 342 Ill. App. 3d at 652. The trial court's ruling indicates it credited Daniel's testimony, which is its prerogative to do. We defer to that credibility determination "[b]ecause the trial court [was] in a far better position to observe the temperaments and personalities of the parties and assess [their] credibility." (Internal quotation marks omitted.) *Spent*, 342 Ill. App. 3d at 652.

¶ 37        In our view, Whitney's argument that the statutory factors overwhelmingly support N.B. living primarily with her in Indiana is an attempt to have this court reweigh the evidence and judge witness credibility, which we will not do. *Jameson*, 2020 IL App (3d) 200048, ¶ 51. Overall, the trial court's decision awarding the majority of parenting time to Daniel and giving the parents joint decision-making responsibility does not stand against the

manifest weight of the evidence because there was evidence to support it and the opposite conclusion is not readily apparent. See *Hefer*, 282 Ill. App. 3d at 80. We see no reason to disturb the "strong and compelling presumption in favor of the result reached by the trial court." (Internal quotation marks omitted.) *Young*, 2018 IL App (4th) 170001, ¶ 64.

¶ 38                                          B. Relocation Petition

¶ 39            Whitney next argues the trial court erred in denying her petition to permanently relocate N.B. to Indiana. She claims the trial court failed to consider the statutory factors laid out in section 609.2 of the Dissolution Act (750 ILCS 5/609.2(g) (West 2020)) and those factors "clearly favor relocation and the finding that Whitney proved, by a preponderance of the evidence, that relocation is in [N.B.]'s best interest." We agree the trial court did not consider the relocation factors in section 609.2(g), but we conclude the trial court did not need to because section 609.2 did not apply to this matter where the trial court had yet to issue a final judgment dissolving the marriage and allocating parenting responsibilities in the first place.

¶ 40            By its own terms, a party may invoke section 609.2 *after* the trial court issues a final parenting plan or allocation judgment. See 750 ILCS 5/609.2(a) (West 2020) (stating "[a] parent's relocation constitutes a substantial change in circumstances for purposes of Section 610.5," which governs modifications of an "existing parenting plan or allocation judgement"); 750 ILCS 5/610.5(c) (West 2020); 750 ILCS 5/609.2(b) (West 2020) ("A parent who has been allocated a majority of parenting time or either parent who has been allocated equal parenting time my seek to relocate with a child."); 750 ILCS 5/609.2(c) (West 2020) (requiring the petitioning parent to "provide written notice of the relocation to the other parent *under the parenting plan or allocation judgment*" (emphasis added)); 750 ILCS 5/609.2(e) (West 2020) (stating that if the non-relocating parent agrees to the relocation, "[t]he court shall modify *the*

*parenting plan or allocation judgment* to accommodate a parent's relocation as agreed by the parents" (emphasis added)); 750 ILCS 5/609.2(f) (West 2020) (referencing the existing "parenting plan or allocation judgment"); 750 ILCS 5/609.2(g) (West 2020) (referencing the existing "parenting plan or allocation judgment").

¶ 41    We acknowledge we previously noted: "[I]t seems clear that section 609 of the [Dissolution] Act applies to cases like the present, where the party seeking custody has moved to another state before the permanent order of custody is entered." *Hefer*, 282 Ill. App. 3d at 78. We observed, "Section 609 specifically state[d] that it applie[d] 'before or after judgment.' " *Hefer*, 282 Ill. App. 3d at 78 (quoting 750 ILCS 5/609(a) (West 1994)). When the General Assembly repealed section 609 and replaced it with section 609.2, it omitted the "before-or-after-judgment" language. As a result, the current iteration of the relocation statute in section 609.2 of the Dissolution Act only contemplates an existing permanent parenting plan or judgment allocation, thereby indicating section 609.2 applies only within those bounds.

¶ 42    Here, there was no permanent parenting plan or judgment allocation in place when Whitney filed her petition to permanently relocate N.B. to Indiana. The parties were operating under an agreed temporary order and then a modified temporary order. These temporary orders did not establish the rights of the parties and so were not final judgments on the merits. See *In re Marriage of Fields*, 283 Ill. App. 3d 894, 901, 671 N.E.2d 85, 90 (1996) ("A temporary order—by its very nature—is *provisional* in character and continues only during the pendency of the action." (Emphasis in original.) (citing *In re Marriage Simmons*, 221 Ill. App. 3d 89, 91, 581 N.E.2d 716, 718 (1991))); see also *In re Marriage of Schroeder*, 215 Ill. App. 3d 156, 165, 574 N.E.2d 834, 840 (1991) ("Temporary orders are not binding on the trial court and are terminated and superseded by the provisions of the final decree."). There is no presumption

in favor of the existing custodian created by a temporary custody order. See *Hefer*, 282 Ill. App. 3d at 78. Because the trial court had not yet entered a final order establishing a parenting plan or judgment allocation, section 609.2(g) of the Dissolution Act could not yet apply, and the trial court rightly denied Whitney's premature petition without considering the statutory relocation factors. And since section 609.2 did not apply, we will not address Whitney's claims that she met her burden for relocation or that the statutory factors "clearly favor relocation." Such determinations should be made, at the appropriate time, by the trial court, which can evaluate the evidence, observe witness credibility firsthand, and then weigh the best interests of the child. See *Hefer*, 282 Ill. App. 3d at 77-79.

¶ 43                               C. Child Support

¶ 44        Whitney's final argument confronts the trial court's decision denying her request for retroactive child support and ordering her to pay child support going forward, arguing the trial court abused its discretion. We disagree.

¶ 45        Decisions awarding or denying child support are "matter[s] within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 978, 605 N.E.2d 670, 680 (1992). A trial court abuses its discretion when "no reasonable person would adopt the position of the trial court." *In re Marriage of Kramer*, 211 Ill. App. 3d 401, 413, 570 N.E.2d 422, 430 (1991).

¶ 46        Whitney requested child support in her March 25, 2019, "Petition for Dissolution of Marriage" and then again when she filed a "Petition for Temporary Child Support and Interim Attorney Fees" on September 9, 2019. She attached a support obligation worksheet to the latter petition. She had previously provided a financial affidavit to Daniel dated May 23, 2019. When the trial court entered a modified temporary order on October 21, 2019, that did not address her

request for temporary child support, Whitney stood silent and did not seek a ruling on her petition, even when the trial court held multiple conference calls with counsel as this case meandered through the discovery and pretrial stages. The trial court denied Whitney's request for child support at the May 2021 hearing because she did not actively pursue her request. The trial court based its decision on "fairness"—twice noting, "I don't think it would be in an interest of fairness" to award retroactive child support because Whitney sat on her 2019 petition for temporary child support for almost two years and asked for a large lump sum at the 2021 hearing. This is not novel reasoning. We previously affirmed a trial court's decision denying retroactive child support in part because the petitioning parent "failed to pursue those claims" over a span of several years. *In re Marriage of Carpel*, 232 Ill. App. 3d 806, 820, 597 N.E.2d 847, 858 (1992). "Retroactive allowance of [child] support in a dissolution proceeding is within the discretionary power of the trial court if such allowance is deemed fit, reasonable and just." *In re Marriage of Rogliano*, 198 Ill. App. 3d 404, 410, 555 N.E.2d 1114, 1118 (1990). Here, the trial court essentially determined it would be unjust or unreasonable to award Whitney retroactive support when she did not actively pursue her claims for child support, which was in its discretion to do. Since we cannot say no reasonable person would adopt the trial court's reasoning, we cannot conclude the trial court abused its discretion. See *Kramer*, 211 Ill. App. 3d at 413; *Carpel*, 232 Ill. App. 3d at 820.

¶ 47                                    III. CONCLUSION

¶ 48            For the reasons stated, we affirm the trial court's judgment.

¶ 49            Affirmed.

- 20 -